# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **ALFRED M. WINDER**<br><br>**Plaintiff**<br><br>v.<br><br>**LOUIS ERSTE, et al.**<br><br>**Defendants** | **Civil Action No.  03-2623(JDB)** |

## <u>MEMORANDUM OPINION</u>

Plaintiff Alfred M. Winder is a former employee of the District of Columbia in the Division of Transportation of the D.C. Public Schools ("DCPS").  He brings this action against defendants the District of Columbia ("the District"), DCPS, and officials associated with DCPS,[1] alleging that he was subject to a hostile work environment and then terminated in violation of his First Amendment and due process rights and 42 U.S.C. § 1983, and his rights under the D.C. and federal Family and Medical Leave Acts, D.C. Code §§ 32-503 et seq., and 29 U.S.C. §§ 2601 et seq.  He further alleges that the termination was in breach of his written employment contract, and that he has suffered a loss of benefits due under the contract.  Before the Court are defendants' motions for summary judgment, which include a supplemental motion addressing the contract claim.  For the reasons explained below, the Court will grant defendants' motions for summary judgment in their entirety, with the exception of the contract claim for benefits allegedly owed to plaintiff.

---

[1]  The individual defendants are: Louis Erste, Chief Operating Officer of the DCPS Division of Transportation; Kennedy Khabo, Operating Officer of the DCPS Division of Transportation; Janet McCullough, Labor Partnership Manager at DCPS; and Elfreda Massie, Acting Superintendent of DCPS.  Plaintiff sues each of these defendants in their individual as well as official capacities, with the exception of Massie, who is sued only in her official capacity.

# BACKGROUND

In August 1999, plaintiff was appointed as the General Manager of the Division of Transportation for DCPS.  Pl.'s Ex. A, Decl. of Alfred M. Winder ("Winder Decl.") ¶ 44.[2] Plaintiff's responsibilities included the management, administration and operation of transportation services for special education students in the D.C. metropolitan area.  Id. ¶¶ 19-20. He also shared in the responsibility for bringing the District into compliance with various Orders issued in Petties v. District of Columbia, Civil Action No. 95-0148 (D.D.C.), a class action lawsuit by D.C. parents alleging that DCPS had failed to provide adequate transportation for special education students.  Winder Decl. ¶ 12; see generally Petties, 2006 WL 1046943, at *1 (D.D.C. Apr. 21, 2006).  Judge Friedman issue a series of orders in Petties mandating specific standards and requirements for the DCPS special education transportation system, and appointed a Special Master (Elise Baach) and a Transportation Administrator (David Healey and, later, David Gilmore) to oversee implementation of the orders.[3]  See generally Petties, 2006 WL 1046943, at *1; Winder Decl. ¶ 44.  Plaintiff worked with the chain-of-command within DCPS, including Louis Erste, the Transportation Division's Chief Operating Officer who also was

---

[2] This position is referred to in various documents as "director," "executive director," and "general manager."  See Winder Decl. ¶ 44 ("general manger"); Pl.'s Ex. K ("director"); Defs.' Ex. 3 at 2 ("executive director"); Defs.' Ex. 5 ("Executive Director/General Manager").   The precise job title is immaterial to resolve the pending claims.  For ease of reference, the Court will refer to the position as General Manager, which the record reflects was the formal job title by at least July 2002 and thereafter.

[3] Plaintiff has described the DCPS Transportation Division as being in receivership at various times.  See Winder Decl. ¶ 29; Pl.'s Mem. at 4-5, 14-15.  Judge Friedman's order indicates that his appointment of a Transportation Administrator in 2000 and again in 2003 was distinct from receivership. See Petties, 2006 WL 1046943, at *1.  The distinction between a receiver and a judicially appointed "transportation administrator" is not significant in the resolution of this matter.

plaintiff's supervisor, in implementing these orders.  Id. ¶¶ 60, 71, 80-81.

As General Manager of the Transportation Division, plaintiff was required to report regularly to the Special Master and her staff, and communicated regularly with the Transportation Administrator.  Winder Decl. ¶¶ 14, 44, 82-83.  From 2000 to 2003, plaintiff repeatedly spoke out against what he perceived to be his supervisors' purposeful resistance to the Petties orders and the general failure of the Transportation Division to meet the standards articulated in Petties.  Id. ¶¶ 60-62.  Plaintiff also protested the Transportation Division's lack of adequately trained drivers; the Division's insufficient budget and diversion of funds to other school departments; the absence of supplies needed for the maintenance of offices and bus terminals; the Division's inaccurate record keeping; and the hiring and retention of unqualified employees and contractors at excessive salaries.  Id. ¶¶ 50-58.

Plaintiff believed that Erste, as well as DCPS General Counsel Veleter Mazyck and DCPS Labor Partnership Manager Janie McCullough, were stonewalling and, at several points, opposing, efforts by the Special Master to bring DCPS into compliance with the Petties orders.  Id. ¶¶ 77-101.  Mazyck allegedly told plaintiff that the Special Master "is not going to run this school system and you don't report to her," and stated several times that she did not intend to cooperate with the Special Master's requests or provide funds to do so.  Id. ¶¶ 79-80.  Plaintiff reported the difficulties he faced within the Transportation Division to the Special Master and the Transportation Administrator.  Id. ¶¶ 61, 83.  These reports allegedly included his belief that Erste had refused to meet staffing needs; failed to discipline absent bus drivers and provide necessary driver training; inaccurately audited employee leave balances; misunderstood transportation scheduling and the driver licensing process; failed to provide parents with appropriate Medicaid reimbursements; and spent transportation funds on other school programs

3

while "transportation funding fell short."  See Second Am. Compl. ¶¶ 40, 43, 48, 56.  Plaintiff

told the Special Master that Erste "did not support [his] efforts at reform, as required by the

Court's orders," id. ¶ 41, and that plaintiff was "being set up as the 'fall guy' by Mazyck and . . .

Erste for Erste's failings."  Id. ¶¶ 48.  In the midst of these events, the term of the first

Transportation Administrator expired on January 31, 2002.  See Petties, 183 F. Supp. 2d 73, 74-

75 (D.D.C. 2002).

        While tensions within the Transportation Division were mounting, DCPS decided to

conduct a "reorganization" in mid-2002, under which DCPS abolished the positions of all

managerial employees and required them to reapply for their positions.  Winder Decl. ¶ 63.

DCPS posted a vacancy announcement for the General Manager position, identifying it as a

"Senior Executive" position, "serv[ing] at the pleasure of the appointing authority."  Defs.' Ex. 7,

at 1.  The duties included "organiz[ing] and implement[ing] the transportation system in

accordance with the policies of DCPS and the Special Education Transportation Corrective

Action Plan approved by the [Petties] Court Order of March 21, 2007," and listed many

associated administrative and management duties.  Id. at 1-3.

        Plaintiff reapplied for the position and, in July 2002, was selected over at least two other

candidates.  See Defs.' Ex. 10.  The terms of plaintiff's employment are summarized in a July 17,

2002 letter signed by plaintiff and defendant Erste which states:

        13.     DCPS agrees to and does hereby employ you as its General Manager of
                Transportation commencing on July 22, 2002, with continued service in
                the position contingent on the final results of your background check.

        14.     Your annual salary will be $103,530.

        15.     Salary reviews will be based upon your achievement of previously
                established objectives and your performance.  Your salary will be
                reviewed annually.  The tenure of this contract is one year from the

commencement date.

16.     You shall be entitled to the full range of fringe benefits including a health
        care benefit plan; disability and life insurance; and an employer paid
        pension plan with a contribution by DCPS of 7% of total compensation.
        Sick and annual leave will be provided according to DCPS's policies and
        guidelines.

17.     The Chief Operating Officer shall review this Agreement with the
        Employee annually, and shall, no less than thirty (30) days prior to the
        expiration of this Agreement or any renewal hereof, take official action
        determining whether or not it is extended for an additional year or other
        mutually agreed upon period of time, and notify Employee of such action
        in writing.

18.     The Chief Operating Officer shall evaluate Employee's performance at
        least once each Agreement year, using criteria, performance objectives and
        goals, and an evaluation process adopted by DCPS for Employee's
        position, and which is communicated to Employee no more than ninety
        (90) days after this Agreement is signed.

Pl.'s Ex. C, at 1-2.  Plaintiff states that he was "never told . . . there were any limitations on the

written employment contract" and the term "probationary" was never used in connection with

plaintiff's employment.  Winder Decl. ¶ 67.  Following his reappointment, plaintiff continued to

perform "the same job as [he] had done before."  Id. ¶¶ 19-20.

        The problems within the Transportation Division soon worsened. From April 2002 to

January 2003, plaintiff made approximately 48 telephone calls to the Special Master and her staff

to report the numerous difficulties he encountered in effectuating compliance with the Petties

orders.  Second Am. Compl. ¶ 55.  As a result of these reports, Erste and McCullough, together

with the newly appointed Operating Officer of the Division of Transportation, Kennedy Khabo,

allegedly began to retaliate against plaintiff.  Id. ¶¶ 57-58.  They told plaintiff that it was "in his

best interest" to resign, and encouraged D.C. parents and school board members to file official

complaints against him.  Id. ¶¶ 58-59.  Khabo also attempted to undermine plaintiff's authority by

5

falsely informing plaintiff's staff that plaintiff intended to resign, and threatening the staff with dismissal if they failed to follow Khabo's orders.  Id. ¶ 61.

On December 3, 2002, plaintiff forwarded Erste an e-mail in which he questioned the removal of $1.2 million from the DCPS special education transportation budget.  Winder Decl. ¶ 85.  These funds were apparently spent on regular education students and bus services with charter service companies, rather than on the transportation of students with disabilities.  Id. ¶ 86. Plaintiff reported his concerns to the Special Master.  Id.

Plaintiff encountered further conflict with Erste the next month.  Plaintiff testified in mid-January 2003 at a meeting of the D.C. Council Committee on Education, Libraries, and Recreation on the subject of a bus driver walkout earlier that month.  Id. ¶¶ 93-94.  Plaintiff states that he was asked by Councilman Chavous to come to the witness stand after Erste and Khabo "failed to give . . . straight answers."  Id.  Erste was angered by plaintiff's testimony, and expressed hostility towards plaintiff after leaving the meeting.  Id. ¶ 94.

On January 28, 2003, the Petties plaintiffs filed a motion to appoint a receiver to bring the Transportation Division into compliance with the Petties orders.  See Petties, 268 F. Supp. 2d 38, 45 (D.D.C. 2003).  Two days later, on January 30, 2003, Erste fired the DCPS Financial Director of Transportation, Mohamed J. Rahim, without plaintiff's knowledge or approval, when Rahim refused to participate in Erste's attempt to make plaintiff the scapegoat for the Division's failures to comply with the Petties orders.  Pl.'s Ex. O.  After Rahim was fired, Khabo and defendant Erste continued to pressure plaintiff to resign.  Winder Decl. ¶ 98; Pl.'s Ex. E, at 4.  Three weeks later, on February 21, 2003, Erste chaired a meeting in plaintiff's office, with plaintiff, his staff, and others in attendance, and allegedly stated "we cannot accept receivership, it's your fault if you can't get these 'F***g' people to work . . . if you can't get them to work , you will be

6

removed."  Pl.'s Ex. E, at 5.

On February 24, 2003, plaintiff filed a formal complaint against Khabo and Erste with the District of Columbia Inspector General.  See Pl.'s Ex. E. at 1-4.  Plaintiff's complaint alleged, inter alia, that Khabo and defendant Erste had filed false affidavits in the Petties litigation; that Erste was abusive to plaintiff's staff; that Erste arbitrarily withheld approval to employ transportation experts who could aid the Division in resolving its under-staffing problems; that the Division's budget was poorly managed; and that plaintiff was being retaliated against by Erste and Khabo "for speaking the truth under [his] 1st amendment rights."  Pl.'s Ex. E. at 1-4.

A month later, on March 20, 2003, plaintiff left work for over two weeks of approved medical leave to undergo extensive oral surgery.[4]  Winder Decl. ¶¶ 18, 108-09.  He had, for several months, been taking antibiotics and painkillers for his condition -- a serious infection involving bleeding gums and abscesses -- but had delayed oral surgery due to the demands of his job.  Id. ¶¶ 104-05.

Plaintiff was terminated while on leave, by letter dated April 3, 2003, without an opportunity to discuss his termination.  Id. ¶ 109; Defs.' Ex. 8.  He received no compensation for his medical leave or other benefits due under his employment contract.[5]  Winder Decl. ¶¶ 18, 109-10.  The next day, plaintiff filed a petition for appeal with the D.C. Office of Employee Appeals ("OEA"), alleging that he had been terminated for filing a claim with the Inspector General in violation of the D.C. Whistleblower Act, and also noted that he had attempted to go

---

[4]  The precise duration of the medical leave -- whether 30 days (Winder Decl. ¶ 18, 108) or two and a half weeks (Winder Depo. at 129) is immaterial.

[5]  Plaintiff estimates that he is owed $40,000 in unused annual leave, $45,260 in comp time, and $8,000 in sick leave.  See Pl.'s Ex. I, at 7.  Plaintiff also contends that defendants still owe him for pension contributions.  See Second Am. Compl. ¶ 127.

on sick leave on two earlier occasions -- February 27, 2003 and March 1, 2003 -- but no

"proposal" was ever given.  Defs.' Ex. 5, at 3.  Plaintiff requested that he be paid all of his

"entitlements, sick [leave], [and] vacation," and also requested that he be restored to his job.  Id.

He also complained that he had never received a performance evaluation in his entire career with

DCPS.  Id.  DCPS responded that plaintiff had no right to appeal because he was a "probationary

employee" (i.e., employed under a term of less than a year) and/or an at-will employee.  Defs.'

Ex. 3, OEA Decision at 3-4 (Dec. 6, 2004) ("OEA Decision").  In resolving plaintiff's appeal, the

OEA held that plaintiff was a probationary employee, and thus had no right of appeal to the

OEA.  Id. at 5.  This meant that plaintiff could not utilize the administrative process provided by

the D.C. Comprehensive Merit Personnel Act.  Id. at 4.

 While his administrative appeal was pending, plaintiff searched for new employment.  See

Winder Decl. ¶115.  Plaintiff asked his friend Wil Parker to speak to then-Deputy Mayor Herb

Tillery about an unspecified transportation position with the District of Columbia government,

based on Parker's acquaintance with Tillery through a church.  Id. ¶ 114.  Parker told plaintiff that

Tillery had told Parker that plaintiff was "persona non grata," and "would not be considered for

the transportation job."  Id.

 In January 2005, plaintiff accepted a position with Atel Bus-Truck ("Atel") as Director of

Business Development for Atel's subcontract with the Baltimore Washington International

Airport ("BWI").  Id, ¶ 116; see also Defs.' Ex. 1, Winder Depo. at 6-9 ("Winder Depo.").  In this

capacity, plaintiff is now responsible for overseeing two bus systems -- the BWI Airport Shuttle

and the D.C. Circulator bus that operates in the District's downtown area.  See Pl.'s Response to

Defs.' Statement of Material Facts ¶ 4; Winder Decl. ¶¶ 2-4, 9; Winder Depo. at 6-9.  Plaintiff

works on commission, and he was paid $95,000 during his first year at Atel, and $92,000 during

his second year.  Winder Decl. ¶¶ 4, 116.  However, plaintiff believes that his position with Atel

provides him with less responsibility and less benefits than his prior position with DCPS,

explaining that he is now entitled to only five days of vacation (in contrast to three weeks), no

compensatory time, and less in health insurance and pension benefits.  Id. ¶¶ 5-7, 116.

Plaintiff filed this action on December 23, 2003, and an initial round of motions practice

narrowing the claims as well as discovery have since been completed.  See Winder, 2005 WL

736639 (D.D.C. Mar. 31, 2005) (dismissing several claims under District of Columbia law); see

also Winder, Order, at 1-6 (D.D.C. Jan. 23, 2007) (reinstating breach of written employment

contract claim).  The claims for relief that remain pending in the Second Amended Complaint are

those alleging that he was subject to a hostile work environment and terminated in violation of

the First Amendment and 42 U.S.C. § 1983 (Counts I and V); that he was terminated in

retaliation for taking medical leave, in violation of the federal and D.C. Family and Medical

Leave Acts (Count III); that he was terminated in breach of a written employment contract and

also lost benefits promised under the contract (Count IX); that he was deprived of his property

interest in employment in violation of his right to procedural due process (Count X); that he was

deprived of his liberty interest in pursuing employment opportunities in his chosen profession

without a name-clearing hearing (Count XI); and that he was deprived of substantive due process

(Count XII).  Defendants have moved for summary judgment on all claims.

## STANDARD OF REVIEW

Summary judgment is appropriate when the pleadings and the evidence demonstrate that

"there is no genuine issue as to any material fact and that the moving party is entitled to judgment

as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears the initial

responsibility of demonstrating the absence of a genuine dispute of material fact.  See Celotex

Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The moving party may successfully support its

motion by "informing the district court of the basis for its motion, and identifying those portions

of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with

the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material

fact."  Id. (quoting Fed. R. Civ. P. 56(c)).

        In determining whether there exists a genuine issue of material fact sufficient to preclude

summary judgment, the court must regard the non-movant's statements as true and accept all

evidence and make all inferences in the non-movant's favor.  See Anderson v. Liberty Lobby,

Inc., 477 U.S. 242, 255 (1986).  A non-moving party, however, must establish more than the

"mere existence of a scintilla of evidence" in support of its position.  Id. at 252.  By pointing to

the absence of evidence proffered by the non-moving party, a moving party may succeed on

summary judgment.  Celotex, 477 U.S. at 322.  "If the evidence is merely colorable, or is not

significantly probative, summary judgment may be granted."  Anderson, 477 U.S. at 249-50

(citations omitted).  Summary judgment is appropriate if the non-movant fails to offer "evidence

on which the jury could reasonably find for the [non-movant]."  Id. at 252.

## DISCUSSION

## I.      First Amendment Claim (Counts I and V)

        In Counts I and V, plaintiff alleges that defendants violated his rights under the First

Amendment when they created a hostile work environment and terminated his employment as

the General Manager of Transportation in response to his criticisms of the transportation

provided for special education students and his supervisors' alleged failure to comply with the

<u>Petties</u> orders.[6]  Specifically, plaintiff alleges he was retaliated against for reporting "the transportation department's failures and inadequacies" to DCPS officials, the <u>Petties</u> Special Master and Transportation Administrator, the D.C. Council, and the D.C. Inspector General. <u>See</u>, <u>e.g.</u>, Second Am. Compl. ¶¶ 30-31, 33, 36, 46-48, 55, 58, 74, 88; <u>see also</u> Pl.'s Mem. at 13, 18-19; Winder Decl. ¶¶ 31, 93-94; Pl's Ex. E.  According to plaintiff, this constitutionally protected speech "was a substantial or motivating factor in the adverse actions taken against him by the D.C. Public Schools and defendants Erste  . . . and McCullough."  Second Am. Compl. ¶ 88.

Defendants move for summary judgment on Counts I and V, relying primarily on the Supreme Court decision issued last year in <u>Garcetti v. Ceballos</u>, 126 S. Ct. 1951, 1961 (2006), which held that speech made pursuant to an employee's official duties is not protected under the First Amendment.  Defs.' Mem. at 23-24; Defs.' Reply Mem. at 1-6.  Defendants also argue that under longstanding precedent the speech of high-level employees on policy matters, in particular, is unprotected.  Plaintiff responds that he was not a high-level employee and did not possess any policymaking authority.  Pl.'s Mem. at 12-17.  Although acknowledging that <u>Garcetti</u> limits his claim, plaintiff contends it is of limited applicability to this case.  <u>Id.</u> at 19.  The Court concludes that plaintiff's speech was made "pursuant to" his responsibilities as DCPS General Manager of Transportation rather than as a private citizen, and thus under <u>Garcetti</u> will grant defendants' motion for summary judgment.

This Circuit has explained that "[t]he speech of public employees enjoys considerable, but not unlimited, First Amendment protection."  <u>Wilburn v. Robinson</u>, 480 F.3d 1140, 1149

---

[6]  Plaintiff brings this claim against the District of Columbia and the DCPS defendants in their official capacities, and against Erste and McCullough in their individual capacities.

(D.C. Cir. 2007) (citing O'Donnell v. Barry, 148 F.3d 1126, 1133 (D.C. Cir. 1998)).  Because

government employers, like private employers, have a strong interest in "ensur[ing] that their

employees' official communications . . . demonstrate sound judgment, and promote the

employer's mission," Garcetti, 126 S.Ct. at 1960, citizens choosing to enter public service "must

accept certain limitations on [their] freedom [of speech]." Id. at 1958.

To determine whether the speech of a public employee is protected by the First

Amendment, the four-factor test developed in Pickering v. Bd. of Educ., 391 U.S. 563, 568

(1968), continues to be applied:

> First, the public employee must have spoken as a citizen on a matter of public
> concern.  Second, the court must consider whether the governmental interest in
> promoting the efficiency of public services it performs through its employees . . .
> outweighs the employee's interest, as a citizen, in commenting upon matters of
> public concern . . . .  Third, the employee must show that her speech was a
> substantial or motivating factor in prompting the retaliatory or punitive act.
> Finally, the employee must refute the government employer's showing, if made,
> that it would have reached the same decision in the absence of the protected
> speech.

Wilburn, 480 F.3d at 1149 (citations and internal quotation marks omitted).

In Garcetti, the Supreme Court elaborated further on the first factor -- speech "as a

citizen" on a matter of public concern -- and held that "when public employees make statements

pursuant to their official duties, the employees are not speaking as citizens for First Amendment

purposes, and the Constitution does not insulate their communications from employer

discipline." Id. at 1960 (emphasis added).  Where the employee is not speaking "as a citizen,"

but instead pursuant to his official duties, "the employee has no First Amendment cause of action

based on his or her employer's reaction to the speech." Id. at 1958.

Thus, a court analyzing a First Amendment claim for retaliation after Garcetti must

determine at the outset whether or not a public employee's speech was made "as a citizen," or

12

instead pursuant to his official employment responsibilities.  See Wilburn, 480 F.3d at 1149

("We first consider whether [the employee] spoke 'as a citizen,'" citing Garcetti); Sigsworth v.

City of Aurora, 487 F.3d 506, 509 (7th Cir. 2007) ("before analyzing whether an employee's

speech is of public concern, a court must determine whether the employee was speaking 'as a

citizen' or, by contrast, pursuant to his duties as a public employee");  see also Williams v. Dallas

Indep. Sch. Dist., 480 F.3d 689, 692 (5th Cir. 2007) (courts post-Garcetti must shift "focus from

the content of the speech to the role the speaker occupied when he said it"); Hill v. Borough of

Kutztown, 455 F.3d 225, 241 (3d Cir. 2006) (public employee's speech is protected only when

"in making it, the employee spoke as a citizen"); Mills v. City of Evansville, 452 F.3d 646, 647

(7th Cir. 2006) ("Garcetti . . . holds that before asking whether the subject-matter of particular

speech is a topic of public concern, the court must decide whether the plaintiff was speaking 'as a

citizen' or as part of her public job").  Only if the employee spoke as a citizen must the court then

assess whether he also spoke "on a matter of public concern."  See Spiegla v. Hull, 481 F.3d 961,

965 (7th Cir. 2007) ("the threshold inquiry is whether the employee was speaking as a citizen;

only then do we inquire into the content of the speech.").  Whether plaintiff spoke "as a citizen"

is a question of law for the court to decide.  Wilburn, 480 F.3d at 1149 (citing Tao v. Freeh, 27

F.3d at 635, 639 (D.C. Cir. 1994)).

Garcetti provides limited guidance on what it means to speak "pursuant to" one's "official

duties," in contrast to speaking as citizen, but it cautioned that a "written job description" or the

location of the speech is not, standing alone, dispositive.  See Williams, 480 F.3d at 692 (citing

Garcetti, 126 S. Ct. at 1959).  This Circuit has observed that action "pursuant to" official duties

has generally been assessed by reference to whether the speech falls "within the scope of the

employee's uncontested employment responsibilities."  Wilburn, 480 F.3d at 1150 (citing Battle

13

v. Bd. of Regents for Ga., 468 F.3d 755, 761 (11th Cir. 2006), and  Hill, 455 F.3d at 241)).

Thus, the Court begins with the scope of plaintiff's employment responsibilities.  Plaintiff admits that, as General Manager of Transportation for DCPS, his responsibilities include "the management, administration, and operation of transportation services for special education students to schools in the District of Columbia, Maryland, and Virginia" and "helping to implement the Court Orders in the Petties case and reporting regularly to Special Master Elise T. Baach."  Winder Decl. ¶19, 44; Second Am. Compl. ¶¶ 17, 29.  Defendants do not dispute this account and, indeed, the 2002 vacancy announcement for plaintiff's position describes duties consistent with plaintiff's description.[7]  See Defs.' Ex. 7 at 1-2.

All of the speech cited by plaintiff in the present action concerned these official duties -- that is, the management and performance of the DCPS Division of Transportation and compliance with the Petties orders.  The "management, administration, and operation of transportation services" plainly encompasses plaintiff's complaints to DCPS officials about the Transportation Division's lack of adequately trained drivers; the Division's insufficient budget and diversion of funds to other school departments; the absence of supplies needed for the maintenance of offices and bus terminals; the Division's inaccurate record keeping; and his supervisors' alleged failures to comply with the Petties orders.  See Second Am. Compl. ¶¶ 31, 32, 40, 43, 46, 48-49, 51, 55-56, 63.  When plaintiff spoke on these matters, he was merely fulfilling the precise job functions that he was "paid to perform."  See Garcetti, 126 S. Ct. at

---

[7]  The vacancy announcement contains a long list of duties, including: (1) determining that all "sums expended . . . are properly accounted for and within budget appropriations"; (2) "addressing complaints and resolving problems" within the Transportation Division; (3) disapproving "any arrangements that are not in conformity with the law and established standards"; and (4) ensuring "compliance with all . . . court mandates."  See Defs.' Ex. 7 at 1-2.

1960. Courts have uniformly held that an employee's communications to his superiors on the

precise subject matter of his employment is unprotected by the First Amendment.[8]  See e.g.,

Spiegla, 481 F.3d at 966-67 (correctional officer's reports of suspected breach of prison security

to superiors was not protected speech where officer had a "general responsibility to keep the

facility secure," and "did not make a public statement, discuss politics with a coworker, [or] write

a letter to newspapers or legislators"); Haynes v. City of Circleville, 474 F.3d 357, 363 (6th Cir.

2007) (police officer responsible for canine unit did not speak as a citizen when he

"communicated solely to his superior" to protest proposed cutbacks in canine training); Mills,

452 F.3d at 648 (police sergeant "spoke in her capacity as a public employee contributing to the

formation and execution of official policy" when she criticized plan to reorganize department

while "on duty, in uniform, and engaged in discussion with her superiors"); Battle, 468 F.3d at

761 (employee in University financial aid office did not speak as a citizen when she reported to

University officials improprieties by colleagues in handling of financial aid funds, as she

"admitted that she had a clear employment duty to ensure the accuracy and completeness of

student files").

Plaintiff's communications with the Petties Special Master and the court-appointed

Transportation Administrator also were clearly within the scope of his responsibilities as General

---

[8]  Plaintiff virtually concedes that his communications to his supervisors, Erste and
Khabo, are not protected under the First Amendment.  See Pl.'s Mem. at 19 ("To the extent that
Winder's communications with Erste and Kahbo were part of his routine or daily duties, it
appears that these communications may no longer be protected under the First Amendment.").
Of course, there is no requirement that communications to supervisors be "daily or routine," as
plaintiff suggests.  The standard is whether the speech is made "pursuant to" official duties.
Wilburn, 480 F.3d at 1150; see also Green v. Bd. of County Comm'rs,  472 F.3d 794, 799-800
(10th Cir. 2007) (finding that speech was made "pursuant to" employment even when it was "not
explicitly required as part of [the employee's] day-to-day job responsibilities").

Manager.  Indeed, in his declaration plaintiff himself states that he was "hired to implement this

Court Order" and that his duties included "implement[ing] the Court Orders and report[ing]

regularly to the Special Master."  See Winder Decl. ¶¶ 14, 44.  Consequently, plaintiff's reports to

the court-appointed officials in Petties regarding the problems plaguing the Transportation

Division were -- just like his reports to his own supervisors at DCPS -- made "pursuant to" his

official duties.[9]

Plaintiff's speech in front of the D.C. Council Committee on Education, Libraries, and

Recreation (id. ¶¶ 93-94) and the D.C. Inspector General (id. ¶¶ 100-01; Pl.'s Ex. E) fares no

better.  Even though these criticisms of the Division constituted a somewhat "unusual" aspect of

plaintiff's employment, such attempts to expose wrongdoing are not covered by the First

Amendment where the speech is "pursuant to" an official duty.  See Wilburn, 480 F.3d at 1150;

Battle, 468 F.3d at 761 (explaining that speech can be considered "pursuant to" one's

employment even where speech concerns "unusual aspect" of employee's job functions, such as

---

[9]  Plaintiff contends that the correctness of his opinions -- that is, the District's failures to comply with the Petties orders -- must be determined by the Court in order to evaluate whether his speech is entitled to First Amendment protection.  See Pl.'s Mem. at 13-15.  That would be true if the Court reached the second factor of the Pickering analysis -- whether the governmental interest in promoting the efficiency of the public services it performs through its employees outweighs the employee's interest, as a citizen, in speaking out (see O'Donnell, 148 F.3d at 1133).  But it is not relevant under the first factor.  In Garcetti, the Supreme Court did not weigh the veracity of the employee's statement in determining whether the employee spoke "as a citizen" or "pursuant to official duties," even though the speech at issue alleged that law enforcement officials had made "serious misrepresentations" to a court." 126 S. Ct. at 1955. Indeed, the Supreme Court observed that redress for truthful but unprotected speech by employees seeking to "expose wrongdoing" would, under its holding, be left to other legal sources, such as whistleblower protection laws, labor codes, and other applicable constitutional provisions.  Id. at 1962.  This strongly suggests that the correctness of the speech is not a factor in determining whether a plaintiff's speech was made "as a citizen."  Because this Court has concluded that plaintiff did not speak "as a citizen," and hence does not reach the second factor of the Pickering analysis, there is no occasion to explore the correctness of the opinions plaintiff expressed.

the exposure of fraud); <u>see also</u> <u>Spiegla</u>, 481 F.3d at 966 (stating that speech need not fit within

employee's "'core' job functions" to be considered "pursuant to" his employment).

Plaintiff's testimony before the D.C. Council Committee arose in the context of a hearing

on the aftermath of a bus driver "walk-out" at which Erste and Khabo initially testified.  Winder

Decl. ¶¶ 93-94.  Plaintiff was present in the room, but not sitting at the witness table.  <u>Id.</u> ¶ 93.

Plaintiff states that Councilman Chavous nonetheless requested that plaintiff testify because

Chavous was not satisfied with the answers provided by plaintiff's supervisors.  <u>Id.</u>  The only

reasonable inference to be drawn from plaintiff's description of that day's events is that he was

asked to testify on the subject of the bus driver situation in his capacity as an employee working

with Erste and Khabo -- that is, as General Manager of the Transportation Division.  Nothing in

plaintiff's description of events indicates he spoke, as he contends, "as a private citizen."

As for plaintiff's complaint to the D.C. Inspector General, it is plain from the face of that

administrative complaint that plaintiff was engaged in speech pursuant to his official duties, in

his capacity as General Manager.  The first line of the administrative complaint states: "<u>As</u>

<u>General Manager of the Division of Transportation</u>, I am now lodging a formal complaint against

Mr. Louis Erste . . . and Mr. Kennedy Khabo . . . ."  Pl.'s Ex. E at 1 (emphasis added).  The

complaint goes on to describe Erste's and Khabo's alleged attempts to undermine plaintiff's

management of the Transportation Division and their disregard of the <u>Petties</u> orders, apparently

seeking to create a record of the events, initiate a formal inquiry, and protect plaintiff and his

staff from further intimidation.  <u>Id.</u> at 2-5.  Other circuits interpreting <u>Garcetti</u> have affirmed that

public employees' allegations of misconduct by their colleagues do not constitute protected

speech merely because the employees are "trying to focus attention on apparently misguided

actions or improper situations."  <u>Green</u>, 472 F.3d at 801; <u>see also</u> <u>Spiegla</u>, 481 F.3d at 967

17

(holding that even when plaintiff's "statements highlighted potential misconduct by prison

officers . . . she was speaking pursuant to her official responsibilities, not as a citizen

'contribut[ing] to the civic discourse'") (quoting <u>Garcetti</u>, 126 S. Ct. at 1960).  Rather, when a

public employee claims he was retaliated against for reporting suspected government

misconduct, the court -- just as in any other case involving allegedly protected First Amendment

speech -- must assess whether the reports of misconduct were made "pursuant to" the employee's

official duties.  It may be the case that some other administrative complaint to an inspector

general will be protected speech, as plaintiff notes.  <u>See</u> Pl.'s Suppl. Mem. at 1 (citing <u>Freitag v.

Ayers</u>, 468 F.3d 528, 545 (9th Cir. 2006)).  But the content of the administrative complaint and

the subject matter of the employee's duties, not to whom it was submitted, will determine

whether the speech is protected.  <u>See</u> <u>Freitag</u>, 468 F.3d at 545 (holding that female prison guard's

complaint to an inspector general concerning sexual harassment was protected speech, made "as

a citizen," and not pursuant to her official duties).  In this case, the plain language of the opening

paragraph of plaintiff's administrative confirms that it was made pursuant to his official duties as

General Manager of Transportation, and the content of that document reinforces that fact.

In short, the Court holds that, as a matter of law, the speech described in the second

amended complaint and plaintiff's declaration was made "pursuant to" his responsibilities as the

General Manager of Transportation rather than as a private citizen.  Accordingly, the Court will

grant defendants' motion for summary judgment on Counts I and V.[10]

---

[10]  In light of the Court's conclusion that plaintiff's speech was not protected under the
First Amendment, the Court has no occasion to reach the separate qualified immunity defense
raised by defendant Erste.

## II.     Claims Pertaining to Plaintiff's Employment Contract (Counts IX and X)

### A.     Due Process and Breach of Contract Claims Based on Premature Termination

Defendants seek summary judgment on plaintiff's claim of deprivation of property without procedural due process on the ground that plaintiff was an at-will employee who had no property interest in continued employment.  See Defs.' Mem. at 6-11.  Defendants further contend that plaintiff's status as an at-will employee was determined by the D.C. Office of Employee Appeals ("OEA"), and that the doctrine of collateral estoppel bars plaintiff from relitigating that finding here.  Defs.' Suppl. Mem. at 4-9.  Plaintiff responds that the OEA decision is not entitled to preclusive effect, and that his written employment contract establishes that he was not employed "at will," but instead had a property interest in his employment for a one-year fixed term.  See Pl.'s Mem. at 22-32.  Plaintiff's claims of deprivation of property without due process and breach of contract based on premature termination overlap because the property interest at issue is continued employment under the contract. See Hall v. Ford, 856 F.2d 255, 265 (D.C. Cir. 1988) ("property interests are 'created and their dimensions are defined by state . . . law,'" and thus a plaintiff's property interest in an employment contract will be determined under local law).  Hence, the Court will address these claims together.[11]

As a threshold matter, the Court addresses defendant's contention that plaintiff is estopped from litigating his status as an at-will employee by the OEA decision of December 6, 2004.  The Supreme Court has held that "when a state agency 'acting in a judicial capacity . . . resolves disputed issues of fact properly before it which the parties have had an adequate

---

[11]  Plaintiff's breach of contract claim has a second prong pertaining to wrongful withholding of benefits due under the contract, including sick and annual leave and pension contributions.  Second Am. Compl. ¶¶ 125-27.  The benefits aspect of this claim will be analyzed separately because it raises an issue that does not rest on whether plaintiff was employed at will.

opportunity to litigate,' federal courts must give the agency's factfinding the same preclusive effect to which it would be entitled in the State's courts." University of Tennessee v. Elliott, 478 U.S. 788, 799 (1986) (citation omitted).  This is so even when the state agency decision has not been reviewed by a state court.  Id.

The OEA's findings, however, are entitled to preclusive effect under University of Tennesse only if they would be entitled to preclusive effect in District of Columbia courts. Under District of Columbia law, the doctrine of collateral estoppel "bars relitigation of an issue when (1) the issue is actually litigated[;] . . . (2) determined by a valid, final judgment on the merits; (3) after a full and fair opportunity for litigation by the parties or their privies; [and] (4) under circumstances where the determination was essential to the judgment, and not merely dictum." Hogue v. Hopper, 728 A.2d 611, 614 (D.C. 1999) (quoting Washington Med. Ctr. v. Holle, 573 A.2d 1269, 1283 (D.C. 1990)) (alterations in original).  The D.C. Court of Appeals has further held that factual findings by the District's administrative agencies acting in a judicial capacity may be entitled to preclusive effect in D.C. courts, emphasizing the threshold requirement that "the earlier proceeding is the essential equivalent of a judicial proceeding." Gallothom, Inc. v. D.C. Alcoholic Beverage Control Bd., 820 A.2d 530, 533 (D.C. 2003).   But the preclusive effect of administrative decisions "is not encrusted with the rigid finality that characterizes the precept in judicial proceedings and there may be practical reasons to refuse to apply the doctrines." Id. (citations and internal quotation marks omitted).  For example, "manifest error in the record of the prior proceeding" is recognized as one exception.  See Oubre v. D.C. Dep't of Employment Servs., 630 A.2d 699, 703-04 (D.C. 1993).

Here, the Court finds that the doctrine of collateral estoppel should not give preclusive effect to OEA's finding that plaintiff was an at-will employee.  First, the OEA decision did not

represent a "judgment on the merits," and a de facto stay of proceedings was in effect while the

OEA considered the jurisdictional issue.  See OEA Decision at 1 ("Since a decision could be

rendered based upon the documents submitted and oral arguments . . . , no further proceedings,

including an administrative hearing on the record, are necessary.").  The absence of a full

adversarial hearing based on a complete record is one fact that indicates that collateral estoppel

should not apply.  See Fonville v. District of Columbia, 448 F. Supp. 2d 21, 25-26 (D.D.C. 2006)

(declining to give preclusive effect to findings of OEA on employee's at-will status where the

issue had not been "fully litigated").  More significantly, the OEA only "assume[d]" that plaintiff

had "career service status" in reaching its conclusion that plaintiff was a "probationary employee"

and, on that basis, an at-will employee, even though the same decision acknowledged elsewhere

that the record indicated that plaintiff was in the Executive Service, rather than the Career

Service.  See OEA Decision at 3-5.  It makes no sense for the Court to give preclusive effect to

an "assumption" made by a local agency, in contrast to a factual finding.  More significantly, that

assumption is, as the Court explains in more detail below, erroneous, according to the

uncontested submissions made by the parties on this record.  Thus, the OEA decision presents a

circumstance of "manifest error" in the record insofar as it is based on the assumption that

plaintiff was in the Career Service.  Hence, the Court will examine anew, based on the record

developed in discovery, whether plaintiff was an at-will employee under the contract.

    In the District of Columbia, there is a presumption that an employment relationship is

"terminable at will by any party at any time" unless evidence shows that the parties intended the

employment to be a "specific term of duration" or subject to specific preconditions before

termination.  Reaves-Bey v. Karr, 840 A.2d 701, 704 (D.C. 2004); Strass v. Kaiser Found. Health

Plan of Mid-Atlantic, 744 A.2d 1000, 1022 (D.C. 2000).  An employer may discharge an at will

employee for any reason or no reason at all.[12]  Reaves-Bey, 840 A.2d at 704.  "This presumption

applies unless the parties state clearly their intention to limit the employer's right to terminate,

such as by a contract provision setting out employment for a fixed term or language that allows

termination only for cause."  Daisley v. Rigss Bank, N.A., 372 F. Supp. 2d 61, 67-68 (D.D.C.

2005) (citations and internal quotation marks omitted); see Simar v. Resolution Trust Corp., 639

A.2d 540, 551 (D.C. 1994) ("This [at will] presumption, however, may be rebutted by 'evidence

that the parties intended employment to be for a fixed period.'").

        The employment contract that plaintiff signed states that "[t]he tenure of this contract is

one year from the commencement date," which is designated in the contract as July 22, 2002.

See Pl.'s Ex. 2, at 1.  At first glance, this provision for a fixed term of employment would seem to

resolve the issue of plaintiff's employment status in plaintiff's favor.  However, defendant points

out that plaintiff was hired to a position in the "Executive Service," in which, by statute,

individuals "serve at the pleasure of the Mayor."  D.C. Code § 1-610.51(b); see also D.C. Mun.

Regs. tit. 6, § 1000.3 (2002).  Consistent therewith, the vacancy announcement for plaintiff's

position states that "APPOINTEES TO THIS POSITION SERVE AT THE PLEASURE OF

THE APPOINTING AUTHORITY."  Defs.' Ex. 7.  The phrase "at the pleasure of" customarily

means "at the will of the employer."  J. David Leonard v. District of Columbia, 794 A.2d 618,

---

[12]   District of Columbia courts recognize a narrow exception to the at will doctrine under
which a discharged employee may bring a tort action for "wrongful discharge when the sole
reason for the discharge is the employee's refusal to violate the law, as expressed in a statute or
municipal regulation."  See Adams v. George W. Cochran & Co., 597 A.2d 28, 34 (D.C. 1991),
discussed in Holman v. Williams, 436 F. Supp. 2d 68, 76 (D.D.C. 2006) (observing that plurality
opinion in Carl v. Children's Hosp., 702 A.2d 159, 163 (D.C. 1997) (en banc), recognized this
exception should also apply to discharges for refusal to violate a constitutional provision).
Plaintiff has not brought a tort action for wrongful discharge in his second amended complaint.
Such an action would most likely be barred, in any event, for failure to comply with the pre-suit
notice provision, D.C. Code § 12-309, as his other tort claims were.

625-26 (D.C. 2002); Hall, 856 F.2d at 265-66 (an employee who agrees to serve "at the pleasure of" his employer is an "at will employee with no legitimate expectation of continued employment") (citing Lyons v. Barrett, 851 F.2d 406, 410 (D.C. Cir. 1988)); see also Wilkinson v. Legal Servs. Corp., 27 F. Supp. 2d 32, 46 (D.D.C. 1998) (holding that one who serves "at the pleasure of" an employer has no property interest in continued employment).

Plaintiff contends that the absence of the clause "at the pleasure of" from the contract document means that it does not apply to him. See Pl.'s Mem. at 23. But the D.C. Code cannot be so easily cast aside. "A person making or seeking to make a contract with a municipal corporation is charged or imputed with knowledge of the scope of the agency's [and its agents'] authority." Marvin L. Leonard v. District of Columbia, 801 A.2d 82, 86 (D.C. 2002) (alterations in original); accord Orange v. District of Columbia, 59 F.3d 1267, 1271 (D.C. Cir. 1995). Plaintiff thus agreed to the employment contract with constructive knowledge that he served at the pleasure of the appointing authority. Of course, this record demonstrates that plaintiff had actual, as well as constructive, knowledge because the vacancy announcement for this position provided notice that the employee would "serve at the pleasure" of the appointing authority." See Defs.' Ex. 7, at 1.

This reading is not inconsistent with the contract provision that plaintiff's term of employment would be one year. Even a contract speaking in terms of "permanent employment" or a "fixed term" may be terminable at will if the circumstances surrounding the making of the contract support that interpretation. See Hodge v. Evans Fin. Corp, 707 F.2d 1566, 1569 (D.C. Cir. 1983) (holding that, on the record before the district court, interpretation of a reference to "permanent employment" could be at will or for cause, depending on what additional evidence was presented on remand); see also Avion Systems, Inc. v. Thompson, --- S.E.2d ---, 2007 WL

1977340, at *3 (Ga. App. 2007) (holding that contract was not divested of mutuality where a fixed term provision limited employee's ability to terminate contract early, but another provision allowed employer to terminate at will; consideration in the form of "definite compensation" sustained the contract).

Defendants and plaintiff spar at length over whether plaintiff was in a probationary period under D.C. Mun. Regs. title 6, § 1601. at the time of his discharge, because probationary status also would mean that plaintiff was employed at will. <u>See</u> Defs.' Mem. at 4-8; Pl.'s Suppl. Mem. at 3-5. As noted above, defendants rely heavily on the OEA conclusion that plaintiff was a probationary employee at the time of his discharge and thus was employed at will. <u>See</u> OEA Decision at 4-5. The flaw in relying on the probationary period framework is that the referenced regulation on probationary periods is applicable only to "Career Service" employees. <u>See</u> D.C. Mun. Regs. title 6, § 1601 ("Section 1601 through 1618 [on discipline and grievances] apply to each employee of the District government <u>in the Career Service</u> who has completed a probationary period."). The evidence submitted by defendants and plaintiff is that plaintiff was employed, instead, in the Executive Service. <u>See</u> Defs.' Ex. 5 (plaintiff's petition for appeal with OEA identifying himself as "Senior Executive Service"); Defs.' Ex. 2 (Office of Human Resources Request of Employment Action identifying plaintiff's classification as "EX," abbreviation for Executive Service). Employees in the Executive Service are not covered by the Career Service regulations. Chapter 8 of the D.C. Municipal Regulations, entitled "Career Service," is explicit on that point: "This Chapter applies to the Career Service of the District of Columbia which consists of all positions in the District government <u>except</u> . . . (h) positions in the Executive Service of the District of Columbia pursuant to §§ 610.1 and 610.2, D.C. Code (1981).") (emphasis added). <u>See</u> D.C. Mun. Regs. title 6, § 800.1; <u>see also id.</u> § 813.2 ("An

24

employee who is appointed to a Career Appointment (Probational) . . . shall be required to serve a probationary period of one year."). The Court therefore does not rely on the probationary period in resolving the issue of whether plaintiff was employed at will.

Hence, the Court finds that there is no genuine issue of material fact that plaintiff was in the Executive Service and thus signed the contract with knowledge that he served at the pleasure of the appointing authority. Because he could be discharged at will "for any reason or no reason at all," defendants did not breach the contract by terminating him prior to the end of his one-year term, and their motion for summary judgment on this aspect of the contract claim (Second Am. Compl. ¶ 124) will be granted. Moreover, employees who are terminable at will have no property interest in continued employment under the Due Process Clause. See, e.g., Piroglu v. Coleman, 25 F.3d 1098, 1104 (D.C. Cir. 1994). Since the only property interest claimed in support of plaintiff's procedural due process claim is his interest in continued employment (see Second Am. Compl. ¶¶ 129-31), defendants' motion for summary judgment will be granted on this claim.

### B.      Benefits Due Under the Contract

To hold that plaintiff had no property interest in continued employment under the contract does not, however, mean that no benefits were owed to plaintiff under the contract. Plaintiff alleges that defendants breached the contract not only by terminating him without cause, but also by denying plaintiff sick and annual leave, compensatory leave, and pension contributions. Second Am. Compl. ¶¶ 126-27. Defendants contend that this aspect of plaintiff's complaint must be dismissed because it is preempted by the D.C. Comprehensive Merit Personnel Act, D.C. Code §§ 1-601.01 et seq. ("CMPA"). Defendants rely on District of Columbia v. Thompson, 593 A.2d 621 (D.C. 1991), for the proposition that the CMPA "provide[s] District employees with

25

their exclusive remedies for claims arising out of employer conduct in handling personnel

ratings, employee grievance, and adverse actions." See Defs.' Suppl. Mem. at 10 (quoting

Thompson, 593 A.2d at 635). But Thompson is not without limitations. As this Court explained

in reinstating plaintiff's breach of contract claim in response to notification of the OEA decision:

> [T]he District of Columbia Court of Appeals has held that "'public employees do
> not lose their common law rights to sue for the[ir] injuries. . . [when] neither those
> injuries nor their consequences trigger the exclusive provisions of the CMPA,'"
> and whether a claim triggers the CMPA is initially determined by the OEA. See
> Grillo v. District of Columbia, 731 A.2d 384, 385-87 (D.C. 1999) (quoting King
> v. Kidd, 640 A.2d 656, 664 (D.C. 1993)). Thus, a suit seeking recourse under the
> common law "may proceed if the OEA concludes that it lacks jurisdiction." Id. at
> 387. "The determination whether the OEA has jurisdiction is 'quintessentially a
> decision for the OEA to make in the first instance.'" Armstead v. District of
> Columbia, 810 A.2d 398, 400 (D.C. 2002) (quoting Grillo, 731 A.2d at 386).

Order (filed Jan. 23, 2007). Here, the OEA concluded that it lacked jurisdiction over plaintiff's

appeal, and stated that plaintiff had no recourse under the CMPA. See OEA Decision at 4.

Therefore, the Court reinstated plaintiff's breach of contract claim. Defendants offer no reason to

revisit this holding. Accordingly, defendants' motion for summary judgment on the benefits

portion of plaintiff's breach of contract claim will be denied.[13] This claim will be allowed to

proceed solely against the District of Columbia. See Order at 5 (filed Jan. 23, 2007).

## III.   Deprivation of Liberty Interest (Count XI)

Plaintiff has asserted a distinct due process claim based on allegedly stigmatizing

statements made by defendants in deprivation of his liberty interest in pursuing employment

opportunities in his chosen profession of transportation management. Second Am. Compl.

---

[13]   Plaintiff also seeks to pursue a breach of contract claim based on defendant's failure to
provide performance evaluations. See Second Am. Compl. ¶ 125. However, considering that
plaintiff could be fired at will -- that is, notwithstanding positive performance evaluations -- it
makes no sense to let this claim proceed. Judgment in defendants' favor on the termination claim
effectively precludes plaintiff from recovering based on the allegedly withheld evaluations.

¶¶ 132-33.  Defendants move for summary judgment on the ground that plaintiff's present employment in a similar transportation management position demonstrates, as a matter of law, that he has not suffered deprivation of a liberty interest.  <u>See</u> Defs.' Mem. at 12-16.  Plaintiff responds that his present position is not similar because the salary and benefits are less, and he went through a period of unemployment.  Pl.'s Mem. at 34-39.

The parties agree, in principle, on the governing law.  "A person's right to . . . follow a chosen profession free from unreasonable governmental interference comes within the 'liberty' . . . concept[] of the Fifth Amendment."  <u>See</u> <u>Trifax Corp. v. District of Columbia</u>, 314 F.3d 641, 643 (D.C. Cir. 2003) (citation and internal quotation marks omitted).  This type of liberty interest may be violated in two ways: (1) through an act of official defamation in conjunction with an adverse employment action, known as a "reputation-plus" claim; or (2) through the combination of an adverse employment action and a "stigma or other disability" that forecloses a plaintiff's freedom to take advantage of other job opportunities, referred to as a "stigma or disability" claim. <u>See</u> <u>O'Donnell</u>, 148 F.3d at 1140-41.  Plaintiff has abandoned any claim under a "reputation-plus" theory.  <u>See</u> Pl.'s Mem. at 35.  He presently alleges only a "stigma" claim based on the statement allegedly made by former deputy mayor Tillery that plaintiff was "persona non grata" and would not be considered for another transportation job for which he had applied. <u>Id.</u> at 36-37.

Plaintiff's claim cannot survive summary judgment for two reasons.  First, plaintiff has failed to produce competent evidence, as required by Fed. R. Civ. P. 56, of the allegedly stigmatizing statement made by Tillery.   The only evidence that plaintiff has adduced in support of his claim is his own declaration that "Parker told me that Tillery told Parker that I was 'persona non grata' and would not be considered for the transportation job, despite my qualifications." Winder Decl. ¶ 114.  The statement attributed to Tillery is double hearsay -- it is plaintiff's

account of his friend's account of the declarant's statement -- a statement the declarant reportedly

does not remember making.  See Pl.'s Mem. at 37 n.14.  "While a nonmovant is not required to

produce evidence in a form that would be admissible at trial, the evidence still must be capable of

being converted into admissible evidence."  Gleklen v. Democratic Congressional Campaign

Comm., 199 F.3d 1365, 1369 (D.C. Cir. 2000) (emphasis in original).  This requirement is

evident in Fed. R. Civ. P. 56(e): "Supporting and opposing affidavits shall be made on personal

knowledge, shall set forth such facts as would be admissible in evidence, and shall show

affirmatively that the affiant is competent to testify to the matters stated therein."  Plaintiff

attempts to overcome this hurdle by suggesting that Parker could testify to the Tillery statement.

But plaintiff has produced no evidence indicating that Parker is likely to do so, nor has he

explained on what basis the hearsay statement, even through Parker, would be admissible.[14]

Thus, as in Gleklen, the hearsay statement offered by plaintiff "counts for nothing," and does not

preclude summary judgment.  Gleklen, 199 F.3d at 1369.

More significantly, even if plaintiff's declaration could be considered competent evidence

of the Tillery statement under Rule 56, defendants still are entitled to summary judgment because

the undisputed evidence shows that plaintiff has not been precluded from employment in his

chosen field of transportation management.  Plaintiff has been employed since January 2005 as

the Director of Business Development with Atel Bus-Truck, where he oversees two

bus systems -- the BWI Airport Shuttle and the D.C. Circulator bus that operates in the District's

downtown area.  See Pl.'s Response to Defs.' Statement of Material Facts ¶ 4; Winder Decl. ¶¶ 2-

4, 9; Winder Depo. at 6-9.  Plaintiff works on commission rather than salary, and earned $95,000

---

[14]  Plaintiff's suggestion that Tillery might testify lacks any basis in the record.  Plaintiff
has indicated Tillery does not recall making the statement.  See Pl.'s Mem. at 37 n.14.

in his first year, and $92,000 in his second year.  Pl.'s Response to Defs.' Statement of Material

Facts ¶ 3; Winder Decl. ¶ 4. This is roughly comparable to his salary of $103,500 as General

Manager of Transportation for DCPS and is within plaintiff's professional field of transportation

management.

Plaintiff contends that his current position is not comparable to the former General

Manager position because his salary and benefits are lower, and he went through a period of

unemployment from April 2003 to December 2004.  See Pl.'s Mem. at 37; Winder Decl. ¶¶ 3-6,

116.  These differences are immaterial in a liberty interest analysis.  Plaintiff must show that the

government action has the effect of "'seriously affect[ing], if not destroy[ing],' a plaintiff's ability

to pursue his chosen profession," or "substantially reduc[ing] the value of his human capital."

O'Donnell, 148 F.3d at 1141 (quoting Kartseva v. Department of State, 37 F.3d 1524, 1529 (D.C.

Cir. 1994)) (alterations in original).  Thus, as Kartseva emphasized, if a plaintiff "has merely lost

one position in her profession but is not foreclosed from reentering the field, she has not carried

her burden."  37 F.3d at 1529 (emphasis added).  Furthermore, the mere fact that a government

action "set [a plaintiff] back on his career path" is not sufficient to demonstrate infringement of a

liberty interest in employment where a plaintiff fails to demonstrate that "his ability to pursue his

chosen profession has been seriously affected, if not destroyed."  O'Donnell, 148 F.3d at 1141-42

(holding that a deputy chief in the D.C. police department who was demoted and later obtained a

position as a police chief of a small town of 6000 failed, as a matter of law, to demonstrate

deprivation of a liberty interest under a "stigma" analysis).  Here, the 21-month period of

unemployment and minor reduction in salary and benefits cannot be described as "substantially"

reducing the value of plaintiff's human capital or indicating that plaintiff was "seriously affected"

in obtaining a position in his profession.  Indeed, quite to the contrary, it demonstrates that he has

not been foreclosed.  Accordingly, defendant's motion for summary judgment on this due process claim will be granted.

## IV.    Substantive Due Process (Count XII)

Plaintiff alleges in Count XII that defendants used their government power to "oppress" plaintiff -- that is, by terminating his employment -- for seeking to comply with judicial orders issued in the Petties litigation.  See Second Am. Compl. ¶¶ 134-35.  Defendants contend that, as a threshold matter, plaintiff's interest in employment is not protected by substantive due process, citing McKinney v. Pate, 20 F.3d 1550, 1560 (11th Cir. 1994) (en banc).  Plaintiff does not directly respond to that case, but contends that he has come forward with sufficient evidence that there is no rational connection between defendants' actions defying the Petties orders and his termination, which he believes is sufficient to allow his claim to go to trial under Yates v. District of Columbia, 324 F.3d 724, 726 (D.C. Cir. 2003).

As a threshold matter, there is substantial doubt as to whether one's interest in public employment is protected by substantive due process.  Several circuits have rejected the proposition that a public employee may have a property interest in employment entitled to substantive due process protection.  See Nicholas v. Pa. State Univ., 227 F.3d 133, 142 (3d Cir. 2000) ("[P]ublic employment is a wholly state-created contract right; it bears little resemblance to other rights and property interests that have been deemed fundamental under the Constitution"); Singleton v. Cecil, 176 F.3d 419, 425-26 (8th Cir. 1999) (en banc) ("a public employee's interest in continued employment with a governmental employer is not so 'fundamental' as to be protected by substantive due process"); McKinney, 20 F.3d at 1560 ("Because employment rights are state-created rights and are not 'fundamental' rights created by the Constitution, they do not enjoy substantive due process protection."); Sutton v. Cleveland Bd.

of Educ., 958 F.2d 1339, 1351 (6th Cir. 1992) ("Absent the infringement of some 'fundamental'

right, . . . termination of public employment does not constitute a denial of substantive due

process."). This Circuit has not addressed this issue. In Yates, the Circuit assumed that a

terminated employee could bring a substantive due process claim, without considering the

threshold issue whether employment interests are covered by substantive due process. See 324

F.3d at 725-26 (rejecting substantive due process claim on the merits, but observing that the

plaintiff may have been objecting to the adequacy of procedural due process).

  This Court finds persuasive those circuits that have held that employment interests are not

protected by substantive due process. But the Court need not decide this claim on that ground,

and indeed, is reluctant to do so in light of Yates. As alleged here, plaintiff does not have a

cognizable substantive due process claim. This Circuit has held that "'where a particular

[Constitutional] Amendment provides an explicit source of constitutional protection against a

particular sort of government behavior, that Amendment, not the more generalized notion of

'substantive due process' must be the guide for analyzing these claims.'" Tri County Indus., Inc.

v. District of Columbia, 104 F.3d 455, 459 (D.C. Cir. 1997) (quoting Albright v. Oliver, 510 U.S.

266, 273 (1994)). Here, plaintiff alleges that the District of Columbia used its powers "to

oppress Winder for seeking to comply with the orders issued by this Court in Petties" and thus

acted contrary to the public interest -- an allegation that is no different than his First Amendment

claim. See Second Am. Compl. ¶ 135. Because the First Amendment more appropriately defines

the scope of constitutional protection applicable to this matter -- and indeed, plaintiff has sought

relief thereunder, albeit unsuccessfully -- his substantive due process claim fails as a

matter of law.[15]

## V.     Family and Medical Leave Act

Although plaintiff contends that he was terminated for speaking out about the District's alleged noncompliance with the Petties orders, he alleges, in the alternative, that he was terminated because he took sick leave, in violation of both the D.C. and the federal Family and Medical Leave Acts, D.C. Code §§ 32-503 et seq., and 29 U.S.C. §§ 2601 et seq. (Count III). Defendants respond that plaintiff has failed to come forward with evidence that plaintiff's use of sick leave was the cause of his termination.[16]  Defendants further submit that, even if plaintiff's evidence supports a prima facie case, defendants are entitled to summary judgment because they have come forward with nondiscriminatory reasons for their actions and plaintiff has failed to show those reasons were a pretext for discrimination.

---

[15]  The Court also rejects the substantive due process claim on the merits.  Only "abuse of power . . . which shocks the conscience" can support a substantive due process claim.  See Fraternal Order of Police Dep't of Corrections Labor Comm. v. Williams, 375 F.3d 1141, 1145 (D.C. Cir. 2004).  The conduct alleged by plaintiff -- which the Court already has concluded does not violate the First Amendment or procedural due process -- similarly does not "shock the conscience."

[16]  Defendants also argued in their initial brief that plaintiff failed to produce evidence of a "serious health condition."  See Defs.' Mem. at 29-33.  Defendants have not pursued this argument following plaintiff's responsive brief and declaration.  See Pl.'s Mem. at 39-43 & Winder Decl. ¶¶ 34, 104-09.  In short, plaintiff submits that he had a "serious health condition" because he had bleeding gums and abscesses that required treatment with antibiotics and prescription painkillers from November 2002 through March 2003, and oral surgery and further gum treatment on approximately seven consecutive work days in March 2003.  Id.  This plainly meets that standard of a "serious health condition" under both the federal and DC FMLA.  See 29 C.F.R. § 825.114(a)(2)(i) (defining "serious health condition" in terms of a "period of incapacity . . . of more than three consecutive calendar days" and "[t]reatment by a health care provider on at least one occasion which results in a regiment of continuing treatment," including prescription medication);  Chang v. Inst. for Public-Private P'ships, Inc., 846 A.2d 318, 329 (D.C. 2004) (holding that federal FMLA regulation defining "serious health condition" is persuasive authority in interpreting same term in DC FMLA).   In light of defendants' failure to respond to plaintiff's submission, the Court finds it unnecessary to address this issue further.

A.      **Framework for Evaluating FMLA Claims**

Both statutes make it unlawful for a covered employer to discriminate against employees for exercising rights protected under the Acts' respective provisions, which are, for present purposes, coterminous.  See 29 U.S.C. § 2615(a)(1); D.C. Code 32-507(a); see also Chang, 846 A.2d at 327 (describing similarities between federal and DC FMLA).  This Circuit and the D.C. Court of Appeals have approved the burden-shifting analysis established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), as a coherent method of evaluating the evidence in support of a claim under both Acts.  Gleklen, 199 F.3d at 1367; Chang, 846 A.2d at 329.

The first step in the framework requires a plaintiff to carry the burden of establishing a prima facie case by a preponderance of the evidence.  McDonnell Douglas, 411 U.S. at 802; Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-53 (1981).  The elements of a prima facie case are the same under both the federal and DC FMLA: "(1) plaintiff engaged in a protected activity under the Acts; (2) he was affected by an adverse employment action; and (3) the protected activity and the adverse employment action were causally connected."  See Winder, 2005 WL 736639, at *14 (citing Gleklen, 199 F.3d at 1368, and Chang, 846 A.2d at 329).

Once the plaintiff establishes a prima facie case, the burden then shifts to the employer to articulate a legitimate, non-discriminatory reason for its actions.  McDonnell Douglas, 411 U.S. at 802.  The employer's burden, however, is merely one of production.  Burdine, 450 U.S. at 254-55.  The employer "need not persuade the court that it was actually motivated by the proffered reasons.  It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff."  Id.

If the employer is successful, the burden shifts back to the plaintiff to show that the

employer's stated reason was a pretext for discrimination.  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000).  The plaintiff "may attempt to establish that he was the victim of intentional discrimination 'by showing that the employer's proffered explanation is unworthy of credence.'"  Id. (quoting Burdine, 450 U.S. at 256).  But "[p]roof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination."  Reeves, 530 U.S. at 147.  Thus, the trier of fact may also "consider the evidence establishing the plaintiff's prima facie case 'and inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is pretextual.'"  Id. (quoting Burdine, 450 U.S. at 255 n.10).  "Whether judgment as a matter of law is appropriate in any particular case will depend on a number of factors . . . includ[ing] the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law."  Reeves, 530 U.S. at 148-49.  As the D.C. Circuit has explained:

> Assuming then that the employer has met its burden of producing a nondiscriminatory reason for its actions, the focus of proceedings at trial (and at summary judgment) will be on whether the jury could infer discrimination from the combination of (1) the plaintiff's prima facie case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff (such as independent evidence of discriminatory statements or attitudes on the part of the employer) or any contrary evidence that may be available to the employer (such as evidence of a strong track record in equal opportunity employment).

Aka v. Washington Hosp. Ctr., 156 F.3d 1284, 1289 (D.C. Cir. 1998) (en banc); see also Waterhouse v. District of Columbia, 298 F.3d 989, 992-993 (D.C. Cir. 2002).

Although the "intermediate evidentiary burdens shift back and forth" under the McDonnell-Douglas framework, "'[t]he ultimate burden of persuading the trier of fact that the

defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'"

Reeves, 530 U.S. at 143 (quoting Burdine, 450 U.S. at 253).   Once the defendant has proffered a

legitimate non-discriminatory reason for its action, then, the question is whether that proffered

reason is a pretext for discrimination.   At this point, the McDonnell Douglas shifting burdens

framework effectively evaporates -- the sole remaining issue is discrimination vel non, and "to

survive summary judgment the plaintiff must show that a reasonable jury could conclude from all

of the evidence that the adverse employment decision was made for a discriminatory reason."

Lathram v. Snow, 336 F.3d 1085, 1088 (D.C. Cir. 2003); see Reeves, 530 U.S. at 142-43.

Examination of that issue in this setting therefore requires consideration of all the relevant

circumstances in evidence, including the strength of the prima facie case, any direct evidence of

discrimination, any circumstantial evidence that defendant's proffered explanation is false (which

may be enough with the prima facie case to infer unlawful discrimination), and any properly

considered evidence supporting the employer's case.   Reeves, 530 U.S. at 147-48; see also

Teneyck v. Omni Shoreham Hotel, 365 F.3d 1139, 1151 (D.C. Cir. 2004); Lathram, 336 F.3d at

1089; Waterhouse, 298 F.3d at 993; Aka, 156 F.3d at 1290.

### B.   Causation

Defendants acknowledge that the Court held, at the pleading stage, that the factual

allegations of plaintiff's complaint were sufficient to support an inference of causation, but

contend that, now that discovery has been completed, plaintiff must come forward with evidence

of more than temporal proximity to establish that his use of sick leave and his termination were

causally connected.   See Defs.' Mem. at 27-29; Defs.' Reply at 10.   The flaw in defendants'

argument is that close temporal proximity between protected activity and an adverse employment

action may, standing alone, be sufficient for a reasonable jury to infer causation.   See Gleklen,

199 F.3d at 1368 (observing, in appeal from summary judgment for employer, that "[t]emporal proximity is often found sufficient to establish the requisite causal connection" and holding that a reasonably jury could thus infer a causal connection on the record under review).  Here, plaintiff went out on sick leave on March 22, 2003, for a two-week period, and was terminated on April 3, 2003, while he was on leave.  See Winder Depo. at 128-29; Defs.' Ex. 8.  Plaintiff has thus come forward with enough to establish a prima facie case of discrimination for taking sick leave.  Such a finding, however, does not end the summary judgment inquiry, for under the McDonnell Douglas burden shifting framework, summary judgment remains available if defendant proffers a nondiscriminatory reason for the termination, and plaintiff fails to show that the stated reason is a pretext for discrimination.

### C.      Defendants' Nondiscriminatory Reason, Pretext, and Discrimination Vel Non

Defendants contend that they are nonetheless entitled to summary judgment because they had a legitimate nondiscriminatory reason for terminating plaintiff.  They note that, by plaintiff's own account of the events, the reasons for his termination had nothing to do with his sick leave.  See Defs.' Mem. at 35 (citing Second Am. Compl. ¶¶ 12-84).  Whatever the words chosen to characterize plaintiff's level of success in managing the DCPS transportation system, there is no dispute that plaintiff and Erste, the Chief Operating Officer of the Division of Transportation, disagreed on significant staffing issues and on transportation priorities, and that this caused a deep-seated mistrust between the two.  See Winder Decl. ¶¶ 51-57, 72, 83-93.[17]  Both parties

---

[17]  For example, plaintiff states that he tried to fire DCPS employees he believed were guilty of stealing from vending machines, "but Erste prevented [him] from doing so."  Winder Decl. ¶ 51.  Plaintiff also avers that he attempted to implement a policy against hiring persons with criminal convictions as bus drivers and attendants, but "Erste prevented [him] from doing so."  Id. ¶ 52.  Plaintiff also disagreed with Erste's hiring choices, citing at least two people hired

(continued...)

further agree that Erste sought to cast the blame on plaintiff for the District's failure to provide

the level of transportation for special education students required by the <u>Petties</u> orders and for the

appointment of the judicially-appointed Transportation Administrator to oversee the operation of

DCPS transportation.  <u>See</u> Defs.' Ex. 11 (Erste Depo. at 153-55) ("plaintiffs filed this huge

motion [for appointment of receiver] which detailed in great verbiage . . . how our transportation

had failed, and to me that was a real wake up call," and describing how Erste then decided to ask

plaintiff to resign); Winder Decl. ¶ 101 (stating that Erste asked plaintiff to resign on February 3,

2003, about one week after the filing of the receivership motion, and describing his subsequent

filing with the Inspector General stating:  "I was certain I was being retaliated against for telling

the truth to Erste and the DCPS and . . . Baach about departmental problems in meeting the

[Petties] Court Order.");  <u>see also</u> Second Am. Compl. ¶ 48 ("Mr. Winder expressed his concerns

to Special Master Baach that he was being set up as the 'fall guy' by defendant Erste and Ms.

Mazyck for defendant Erste's failings.").

      In opposing summary judgment, plaintiff makes much of the issue of "whether the failure

of DCPS's Transportation Department arose from any failure on Winder's part, or whether the

'failure' arose from defendants' refusal to comply with the Court's Orders in <u>Petties</u>."  Pl.'s Mem.,

---

[17](...continued)
at "high salar[ies]" whom plaintiff considered an inappropriate "drain on the DCPS budget."  <u>Id.</u>
¶¶ 56-57.  Plaintiff also notes that Erste fired two of plaintiff's aides -- Mohamed J. Rahim and
Elliott Jones -- without his knowledge or approval.  <u>Id.</u> ¶ 72.
      Plaintiff also spoke out on numerous occasions regarding defendants' alleged failure to
make efforts to comply with the <u>Petties</u> orders or cooperate with Special Master Baach.  <u>See, e.g.,</u>
<u>id.</u> ¶¶ 83 ("I reported to Special Master Baach that DCPSA was not going to comply with the
<u>Petties</u> decrees."); ¶¶ 85-86 ("I forwarded an e-mail to Erste questioning the removal of $1.2
million dollars from the transportation budget of D.C.'s special education students . . . . I reported
the diversion of these funds to Special Master Baach."); ¶ 93 ("When Erste and Khabo failed to
give Councilman Chavous straight answers, Chavous asked me to come to the witness table to
answer questions.  I did so.").

at 46-47.  But the Court need not resolve the factual issue of who was to blame for the District's

compliance problems in <u>Petties</u> in order to resolve plaintiff's FMLA claims, for the undisputed

record establishes that reasons wholly unrelated to plaintiff's sick leave -- primarily, laying fault

upon plaintiff for the problems in the <u>Petties</u> case, deservedly or not, and silencing a dissenting

voice -- motivated plaintiff's termination.  Plaintiff himself attested to this at his deposition:

> Q: You think you were fired because you took sick leave?
>
> A: I don't know why I was fired.  I really don't.  To this day, I don't know.  The
> only thing I can even comprehend is that I spoke out well before my termination.
> I spoke out throughout my tenure.  I spoke out in January [2003] specifically to
> the attorney -- to the IG.

Winder Depo. at 126.   Plaintiff's statements to the Inspector General in late February 2003,

contemporaneous with his firing, further indicate that he believed Erste blamed him, albeit

wrongfully, for the potential receivership situation and threatened plaintiff with termination:

"Mr. Erste stated we cannot accept receivership, it's your fault if you can't get these 'F***g'

people to work . . . if you can't get them to work, you will be removed."  Pl.'s Ex. E, at 5.  Thus, it

is evident that while plaintiff steadfastly believes that defendants' proffered reasons for

termination are pretext, he does not assert they are "pretext for discrimination" against him for

using sick leave, but instead that they are pretext for retaliating against him for publicly

criticizing defendants.  That is not sufficient to avoid summary judgment -- plaintiff must come

forward with some evidence that the "proffered reason was a pretext <u>for</u> <u>discrimination</u>."  <u>Stewart</u>

<u>v. Ashcroft</u>, 352 F.3d 422, 430 (D.C. Cir. 2003) (emphasis added).

Considering, then, the issue of discrimination <u>vel</u> <u>non</u>, the Court weighs the weakness of

plaintiff's prima facie case, which relies solely on temporal proximity to support an inference of

causation, and the overwhelming evidence that the other factors described above, wholly

unrelated to plaintiff's sick leave, motivated plaintiff's termination.  The Court concludes that no

reasonable jury could find that defendants terminated plaintiff because he took sick leave.  <u>See</u>

<u>Stewart</u>, 352 F.3d at 430 (holding that, where employer offered nondiscriminatory reasons for

adverse action, and "there is a complete lack of evidence in the record that indicates [protected

status] was a factor," no reasonable jury could find discrimination).  Accordingly, the Court will

grant defendants' motion for summary judgment on plaintiff's federal and DC FMLA claims.

## **CONCLUSION**

For the foregoing reasons, the Court will grant defendants' motion for summary judgment

in its entirety, with the exception of the contract claim in Count IX for benefits allegedly owed to

plaintiff.  A separate order accompanies this memorandum opinion.


_____/s/_____
JOHN D. BATES
United States District Judge

Dated:   September 30, 2007