\UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **ALFRED M.  WINDER**<br><br>**Plaintiff,**<br><br>v.<br><br>**LOUIS ERSTE, et al.,**<br><br>**Defendants.** | **Civil Action No.  03-2623 (JDB)** |

## MEMORANDUM OPINION

Plaintiff Alfred M. Winder is a former employee of the District of Columbia in the Division of Transportation of the D.C. Public Schools ("DCPS").  He brings this action against the District of Columbia and DCPS official Louis Erste.  After over nine years of litigation, plaintiff has three remaining claims: breach of contract based on premature termination; deprivation of property without procedural due process; and violations by the District under the District of Columbia's Whistleblower Protection Act ("DC WPA").  Defendants have moved for summary judgment on the procedural due process and DC WPA claims. For the reasons discussed below, the Court will GRANT the motion for summary judgment on the procedural due process claim and GRANT IN PART and DENY IN PART the motion for summary judgment on the DC WPA claim.

## BACKGROUND

This case has a long and complex history, which has been set forth more fully in previous opinions.  See, e.g., Winder v. Erste, Civ. Action No. 03-2623, 2005 WL 736639, at *1-3 (D.D.C. Mar. 31, 2005); Winder v. Erste, 511 F. Supp. 2d 160, 165-170 (D.D.C. 2007); Winder v. Erste,

566 F.3d 209, 211-13 (D.C. Cir. 2009); Winder v. Erste, 767 F. Supp. 2d 179, 179-80 (D.D.C. 2011). In 1999, Winder was hired as General Manager of the DCPS Division of Transportation where he oversaw the operation of transportation services for special education students in the District. Pl.'s Stmt. of Material Facts for DC WPA Summ. J. Mot. ("Pl.'s WPA Stmt.") ¶¶ 2-3. Winder was brought into DCPS to assist the District in complying with the various orders issued in Petties v. District of Columbia, Civil Action No. 95-0148-PLF (D.D.C) ("Petties orders"). He worked for DCPS in that capacity pursuant to a series of employment contracts until his termination in April 2003.

Sometime in May 2002, Winder received a letter indicating that his position would be abolished through a Reduction in Force ("RIF"). See Pl.'s Stmt. of Material Facts for Qual. Immun. Summ. J. Mot. ("Pl.'s QI Stmt.")  ¶¶ 1,9.   However, the timing and the applicability of the RIF to Winder's position, and the nature of Winder's employment from that point onward, are disputed.  Defendants argue that plaintiff's position was lost due to the RIF on May 3, 2002 and that he was later hired into a new position, "Supervisory Management and Program Analyst," which was confirmed by letter on July 22, 2002.  Erste's Stmt. of Material Facts for Qual. Immun. Summ. J. Mot. ("Def.'s QI Stmt.") ¶¶ 9-10, 12. Winder claims that the RIF did not affect him because he had already signed his new employment contract, Pl.'s QI Stmt. ¶¶ 5, 9, 10, 12, but he does not dispute that he applied for a vacancy in 2002, was selected for the position, and then worked in the same capacity as he did previously. Id. ¶¶ 9-10.

From the outset, Winder took issue with what he perceived as DCPS's lack of commitment in complying with the Petties orders.  Pl.'s WPA Stmt. ¶¶ 4, 64.  From 2000 to 2003, Winder regularly complained to Special Master Baach, who was charged with overseeing the implementation of the Petties orders, about DCPS's attitude toward compliance.  Id. ¶ 5.  In early

2001, Erste was hired as DCPS's Chief Operating Officer.  Id. ¶ 7.  According to Winder, Erste

had no intention of complying with the Petties orders, and his complaints all arise from that

principal grievance.  Id. ¶¶ 73-74.

Winder's relationship with Erste worsened over time, and his litany of criticisms -- mostly

against Erste, but also against DCPS generally -- is long and sprawling.  He complained about

Erste's failure to cooperate with Special Master Baach and his unwillingness to provide Winder

with resources to comply with the Petties orders.  Id. ¶¶ 78-89.  He criticized Erste's diversion of

funds and resources from special education transportation to other department needs and uses, id.

¶¶ 95-103, 160-64, and the failure to maintain clean transportation facilities, id. ¶¶ 81, 103, 158.

He complained about Erste's hiring practices, including the hiring of unqualified employees and

the practice of nepotism, id. ¶¶ 104-42.  He also complained about the hiring of Kennedy Khabo,

who, as Operating Officer of the Division of Transportation, was Winder's supervisor. Sec. Am.

Compl. ¶ 7; Pl.'s WPA Stmt. ¶¶ 122-24.  Winder complained about these problems to Erste, the

Special Master and her staff, DCPS legal counsel, and school board and city council members on

numerous occasions.  Erste, in return, blamed Winder for the alleged mismanagement.

Winder's complaints increased in the last year of his employment. In particular, his

grievances were amplified in the August 2002 to March 2003 time period, when he claims that he

communicated Erste's attitude "and his lies about providing adequate transportation resources"

approximately "15 to 20 different times." Id. ¶ 80.  On December 3, 2002, Winder also sent Erste

an e-mail in which he questioned the removal of $1.2 or $1.5 million from the DCPS special

education transportation budget.[1]  2007 Winder Decl. ¶ 85; Pl.'s WPA Stmt. ¶ 99.  These funds

---

[1] The record is unclear as to whether the amount was $1.2 million or $1.5 million.  Both figures
are mentioned.

were apparently spent on regular education students, not on the transportation of students with disabilities. 2007 Winder Decl. ¶ 86; Pl.'s WPA Stmt. ¶ 99.  Winder reported his concerns to the Special Master, both before and after the December 3, 2002 email. Pl.'s WPA Stmt. ¶ 100.

From December 2002 to January 2003, Winder encountered further conflict with Erste relating to the work stoppage of bus drivers. Winder claims that around Christmas 2002, he disclosed to Erste problems with the drivers' leave records and inaccurate recordkeeping of their holiday pay that could cause labor problems.  He claims that Erste left on vacation without addressing the issue.  Pl.'s Ans. to Def.'s Interrogatories at 8.  Winder continued to warn Erste in the first two weeks of January 2003 that a possible work stoppage might occur due to driver dissatisfaction with the recordkeeping of their pay. Id. This work stoppage eventually took place on January 16 and 17, 2003. Pl.'s WPA Stmt. ¶ 156.

Shortly after the walkout, Winder testified about the work stoppage at a meeting of the D.C. Council Committee on Education, Libraries, and Recreation. 2007 Winder Decl. ¶¶ 93-94. D.C. Council member Kevin Chavous was unsatisfied with Erste and Khabo's responses, and called Winder to the witness table to answer questions.  Pl.'s WPA Stmt.¶ 179 (citing 2007 Winder Aff. ¶ 93).  After Winder's testimony, Erste "express[ed] opposition and hostility" and Winder heard Erste tell Kevin Walsh, who worked for Special Master Baach, that "I should have fired that motherf****r when I had the chance."  Pl.'s WPA Stmt. ¶ 180; 2007 Winder Decl. ¶ 94. On January 28, 2003, the Petties plaintiffs filed a motion to appoint a receiver to bring the Transportation Division into compliance with the Petties orders.  See Petties v. District of Columbia, 268 F. Supp. 2d 38, 45 (D.D.C. 2003); Pl.'s WPA Stmt. ¶ 178.

Winder and Erste met on February 3, 2002 to discuss the District's opposition to the motion to appoint a receiver.  Pl.'s WPA Stmt. ¶ 182.  According to Winder, Erste wanted him to

submit a false affidavit stating that all positions within Winder's department had been filled and that the department was fully funded. Id. ¶¶ 182-85.  When Winder refused, he claimed that Erste stated, "'I'll take care of you down the road' or words to that effect."  Id. ¶ 185.  During that same meeting, Erste told Winder that he would have to resign.  Id. ¶ 186.  A few days later, Khabo also told Winder that Erste wanted him to resign. Id. ¶ 187.

On February 24, 2003, Winder filed a formal complaint against Khabo and Erste with the District of Columbia Inspector General.  See Pl.'s Ex. E at 1-4, ECF No. 94-7.  He alleged, inter alia, that Khabo and defendant Erste had filed false affidavits in the Petties litigation and that Winder was being retaliated against by Erste and Khabo for telling the truth to the Special Master about departmental problems in meeting the court orders, and he raised concerns that his rights under the First Amendment and the DC WPA were being violated.

A month later, on March 20, 2003, Winder left work on approved medical leave.  2007 Winder Decl. ¶¶ 18, 108-09.  While on leave, Winder was terminated by letter dated April 3, 2003, without an opportunity to discuss his termination.  Id. ¶ 109. The letter claimed that Winder was being discharged as a probationary employee, a claim that Winder has disputed throughout this litigation. Ex. 2 to Def.'s Mot. for Summ. J. Based on Qual. Immun. ("Def.'s QI Mot."), ECF No. 159-2.  Defendants also claim that Winder was terminated for failing to perform, including Winder's failure to avoid receivership.  Def.'s QI Mot. at 2; Def.'s QI Stmt. ¶ 22.  On June 25, 2003, the District and plaintiffs in the Petties litigation consented to the appointment of an independent transportation administrator to resolve the motion for appointment of a receiver. Pl.'s WPA Stmt. ¶ 196.

Initially, Winder asserted a myriad of claims before this Court. In its March 2005 decision, this Court granted defendants' motion to dismiss several claims, including Winder's DC WPA

claim on the basis of Winder's failure to comply with the notice provisions of D.C. Code § 12-309. See generally Winder v. Erste, 2005 WL 736639 (D.D.C. Mar. 31, 2005). Eight months later, Winder amended his complaint a second time, adding additional claims for breach of contract, denial of substantive and procedural due process, and deprivation of a liberty interest without a name clearing hearing. See Pl.'s Mot. to Amend, ECF No. 59. This Court subsequently granted defendants' motion for summary judgment on the remaining claims, with the exception of plaintiff's written breach of contract claim for benefits allegedly owed. See Winder, 511 F. Supp. 2d at 187. In May 2008, the Court awarded plaintiff $8,958.60 plus prejudgment interest accruing from April 3, 2003 for plaintiff's unpaid salary and annual leave. See Winder, 555 F. Supp. 2d at 112.

In May 2009, the D.C. Circuit affirmed this Court on all matters, with the exception of plaintiff's premature termination and procedural due process claims. Winder, 566 F.3d at 219. The D.C. Circuit reversed and remanded these claims "because [plaintiff's] employment classification is muddled at best . . . [and] . . . there is a genuine question whether DCPS could terminate him when it did." Id. at 217. On remand, the parties filed cross-motions for summary judgment on these claims. The Court denied both parties' motions on the premature termination claim "[g]iven that several relevant facts regarding plaintiff's employment status remain in genuine dispute." Winder, 767 F. Supp. 2d at 184. It reserved ruling on the procedural due process claims, given the uncertainty of Winder's employment status. Id. at 184 n.2. The Court also allowed Winder to reinstate his DC WPA claim after the original basis for dismissal -- failure to comply with D.C. Code § 12-309's notice requirement – was no longer applicable when the Whistleblower Amendment Act of 2009 eliminated the requirement for DC WPA claims. See Mem. Op. & Order 2, 5 (Mar. 7, 2011), ECF No. 155.

Now, Erste has filed a motion for summary judgment based on his qualified immunity from the procedural due process claim,[2] and the District of Columbia has filed a motion for summary judgment based on plaintiff's DC WPA claims.  Voluminous briefs were received from both parties, and a motions hearing was held.

## STANDARD OF REVIEW

Summary judgment is appropriate when the pleadings and the evidence demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party seeking summary judgment bears the initial responsibility of demonstrating the absence of a genuine dispute of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The moving party may successfully support its motion by identifying those portions of "the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of motion only), admissions, interrogatory answers, or other materials," which it believes demonstrate the absence of a genuine issue of material fact.  Fed. R. Civ. P. 56(c)(1); see Celotex, 477 U.S. at 323.[3]

---

[2] Plaintiff also filed a motion in limine seeking to bar Erste's testimony from this Court's consideration with respect to the summary judgment motion on qualified immunity.  That motion was denied.  See Order (Sept. 28, 2012), ECF No. 198.

[3] As a preliminary matter, both parties refer to materials attached to their prior pleadings in this latest round of summary judgment briefing. Therefore, it is appropriate for the Court to consider the record in its entirety.  See, e.g., Wright & Miller, Fed. Prac. & Procedure § 2721 (collecting cases where courts deciding summary judgment motions have considered the entire record, including previously submitted materials unrelated to the motion); see also Stephanischen v. Merchants Despatch Transp. Corp., 722 F.2d 922, 930-33 (1st Cir. 1983) (citing court's obligation to consider "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits'" and noting no limitation on the court's examination to "evidence pinpointed in the parties' memoranda.") (citing Fed. R. Civ. Proc. 56(c)).

In determining whether there exists a genuine dispute of material fact sufficient to preclude summary judgment, the court must regard the non-movant's statements as true and accept all evidence and make all inferences in the non-movant's favor.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  A non-moving party, however, must establish more than the "mere existence of a scintilla of evidence" in support of its position.  Id. at 252.  By pointing to the absence of evidence proffered by the non-moving party, a moving party may succeed on summary judgment.  Celotex, 477 U.S. at 322.  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  Anderson, 477 U.S. at 249-50 (citations omitted).  Summary judgment is appropriate if the non-movant fails to offer "evidence on which the jury could reasonably find for the [non-movant]."  Id. at 252.

## DISCUSSION

**I.**    **Qualified Immunity**

"Qualified immunity balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably."  Pearson v. Callahan, 555 U.S. 223, 231 (2009).  "The central purpose of affording public officials qualified immunity from suit is to protect them 'from undue interference with their duties and from potentially disabling threats of liability.'"  Elder v. Holloway, 510 U.S. 510, 513 (1994) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 806 (1982)).

The doctrine "protects State officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Pearson, 555 U.S. at 231 (quoting Harlow, 457 U.S. at 818); see also

Butera v. District of Columbia, 235 F.3d 637, 645-46 (D.C. Cir. 2001).  Courts follow a two-prong analysis in analyzing a qualified immunity defense.  Pearson, 555 U.S. at 232.  The court considers "'whether the plaintiff has alleged the deprivation of a constitutional right at all.'"  Butera, 235 F.3d at 646 (quoting Wilson v. Layne, 526 U.S. 603, 609 (1999)); see also Scott v. Harris, 550 U.S. 372, 377-78 (2007).  Courts also look to whether such a right is "clearly established."  Butera, 235 F.3d at 646.  A right is "clearly established" if "[t]he contours of the right [are] . . . sufficiently clear that a reasonable official would understand that what he is doing violates that right."  Anderson v. Creighton, 483 U.S. 635, 640 (1987); see also Butera, 235 F.3d at 646.  Although, in most instances, courts determine first whether there has been a violation of a plaintiff's right, see Saucier v. Katz, 533 U.S. 194, 201 (2001), the Supreme Court has explicitly held that the sequence in which this two-prong inquiry is addressed is left to the discretion of the district court, based on the circumstances of the particular case, Pearson, 555 U.S. at 236.

As an initial matter, Erste and Winder disagree over the proper burden of proof with respect to the qualified immunity defense. Because qualified immunity is an affirmative defense, "the burden of pleading it rests with the defendant." Crawford-El v. Britton, 523 U.S. 574, 588 (1998) (quoting Gomez v. Toledo, 446 U.S. 635, 639-41 (1980)). However, once asserted, the burden of proof then falls to the plaintiff to show that the official is not entitled to qualified immunity.  See, e.g., Miller v. Admin. Office of the U.S. Courts, 448 F.3d 887, 894 (6th Cir. 2006).  The court must look to whether the facts that a plaintiff has "alleged . . . or shown . . . make out a violation of a constitutional right." Pearson, 555 U.S. at 232 (citing Saucier, 533 U.S. at 201).  Moreover, "[a] plaintiff who seeks damages for violation of constitutional or statutory rights may overcome the defendant official's qualified immunity only by *showing* that those rights

were clearly established at the time of the conduct at issue." Elder, 510 U.S. at 513 (emphasis in

original).  However, even if a plaintiff can establish that there was a violation of a clearly

established constitutional or statutory right, a defendant seeking qualified immunity can still

demonstrate that there were extraordinary circumstances for why the defendant either did not

know or have reason to know that his actions would violate a constitutional right.

Erste argues that he is protected by qualified immunity from Winder's procedural due

process claim because it is not "clearly established" that Winder had a property interest in his

continued employment when Erste terminated him.  See Erste's Mot. for Summ. J. Based on

Qualified Immun. ("Def.'s QI Mot.") at 7-9.  The Court agrees.  In order for Winder to succeed on

his procedural due process claim, he would have to show that he had a property right to continued

employment under his contract. However, "if the contract did not give Winder a property interest

in an employment term of one year, DCPS could not have violated the process rights by depriving

him of that interest." Winder, 566 F.3d at 216.  As this Court previously observed, "in order for

plaintiff to succeed on his claims, he must show that he was not an employee-at-will and instead

was a contract employee with a vested interest in continued employment through the length of his

contract."  Winder, 182 F. Supp. 2d at 182.

But this issue is hardly straightforward.  Both this Court and the D.C. Circuit have

described at length the confusing, and indeed sometimes contradictory, evidence in the record

relating to the nature of Winder's employment classification.  See, e.g., Winder, 767 F. Supp. 2d at

182-84; Winder, 566 F.3d at 216-17.  For instance, one unresolved question relates to whether

Winder, under the terms of his new contract, was subject to a probationary period and hence could

be terminated without notice and a hearing any time during that period. Based on this mixed law

and fact question, which required a "determination [that] is heavily dependent on several relevant facts that remain at issue in this case," id. at 183-84, this Court previously found that summary judgment was inappropriate, id. at 184.  Prior to that, the D.C. Circuit, in remanding the case back to this Court in 2009, observed that "[t]he meaning of Winder's classification [being] unclear" and "[b]ecause Winder's employment classification is muddled at best, there is a genuine question whether DCPS could terminate him when it did." Winder, 566 F.3d at 217.

Miller v. Admin. Office of the U.S. Courts confronted similar issues.  Like Winder, the plaintiff in Miller had retired from her job as a jury-pool manager, but was thereafter reappointed to the same job with the same duties and the same pay.  Miller, 448 F.3d at 889.  There, the court noted that whether the plaintiff was a tenured or non-tenured employee was a "difficult" issue given the conflicting evidence in the record.  Id. at 895. Prior to plaintiff's termination, three individuals had been consulted as to the status of plaintiff's employment: an attorney for the Administrative Office of the Courts ("AOC"), the AOC Director and former general counsel, and the AOC personnel director.  All three advised that the plaintiff was a non-tenured employee.  Id. at 896-97.  The Sixth Circuit ultimately affirmed the district court's grant of qualified immunity, reasoning that because the terminating officials conducted a pre-termination investigation into plaintiff's status to decide whether special procedures needed to be followed to lawfully terminate her, and the advice was consistent that she was not tenured, "a reasonable officer would not have clearly known that terminating Miller without the procedures required only for tenured employees was unlawful." Id. at 896-97.  The Sixth Circuit further stated that the decision to terminate plaintiff "was simply not objectively unreasonable based on the information [the terminating officials] had received in their pretermination investigation." Id. (internal citations and quotations

omitted).

Here, Erste has submitted evidence that he consulted with DCPS's Human Resources Department and the General Counsel's Office to determine whether Winder's employment status allowed him to be terminated under the procedures provided. See Dep. of Veleter Mazyck 10:20-11:1 (July 19, 2011) ("Mazyck Dep."); Dep. of Louis Erste 123:5-9 (Sept. 20, 2005) ("2005 Erste Dep."). A memorandum from James Baxley, who worked in the General Counsel's office, indicates that employees who were rehired after the RIF were obligated to serve a one-year probationary period. See Ex. 9 to Def.'s QI Mot, ECF No. 159-10. And, as this Court expressed, there remains an open question whether the July 17, 2002 letter, which Winder characterizes as a "contract," Pl.'s QI Stmt. ¶ 26, and which defendants call a "confirmation," Def.'s QI Stmt. ¶ 12; Mot. Hr'g Tr. 8:10-12, nevertheless required him to serve a one year probationary term. See Winder, 767 F. Supp. 2d at 183-84. The record is riddled with discrepancies and uncertainties with regard to Winder's employment classification and status, which are further detailed in previous opinions issued by this Court and the D.C. Circuit. For example, Winder does not dispute that he applied for his job pursuant to the vacancy announcement, which stated that "appointees to this position serve at the pleasure of the appointing authority." Ex. 4 to Def.'s QI Mot. This document suggests that Winder's position may have been "at-will," and that the District could terminate him without pretermination notice and a hearing. However, the July 17, 2002 letter stated that he would be employed for a term of one year. See Ex. 1 to Def.'s QI Mot. Adding to the mystery, as the D.C. Circuit observed, Winder's personnel records indicate that he may have been paid in accordance with an "EX" payscale; however, no such pay classification exists for such positions. See Winder, 566 F.3d at 217.

But under the test for qualified immunity on Winder's constitutional claim against Erste, the Court need not fully resolve the issue of Winder's employment rights.  The question is whether such rights were clearly established in 2003.  Given these remaining questions of law and fact, which are unresolved despite several rounds of summary judgment motions and ongoing litigation that has lasted for over nine years, it could hardly be said that Winder's right to continued employment was so clearly established "that a reasonable official would understand that what he is doing violates that right," Anderson v. Creighton, 483 U.S. 635, 640 (1987).  That is underscored by the convoluted record before the Court.  Hence, Erste is entitled to qualified immunity on the procedural due process claim and it must be dismissed.

Winder spends much time analyzing the various approaches taken by the circuits to a defense based on reliance of counsel and the proper standards for analyzing such a claim with respect to Erste's entitlement to qualified immunity.  His arguments, however, miss the point. Erste refers to legal advice he received from DCPS counsel as "one of the factor[s]" indicating that "it was not clearly established" that terminating Winder on the basis of his "at-will" or his probationary employment status "would violate Mr. Winder's rights under the [C]onstitution." See Def.'s QI Mot. at 8.  However, even the Tenth Circuit standard advocated by Winder pre-supposes the existence of a violation of a clearly established right.  Because the Court finds that Winder cannot demonstrate that there was a violation of a clearly established right, it need not spend much time analyzing the particular intricacies of the parties' arguments respecting the advice of counsel. That issue is only reached if there was a clearly established right.  See Lawrence v. Reed, 406 F.3d 1224, 1230 (10th Cir. 2005) ("If the law was clearly established, we reach the third step of the inquiry: whether, in spite of the fact that the law was clearly established, 'extraordinary

circumstances' – such as the reliance on the advice of counsel . . . so prevented [the official] from knowing that his actions were unconstitutional that he should not be imputed with knowledge of a clearly established right.") (internal quotations and citations omitted).  Here, the Court concludes, there <u>was</u> <u>not</u> a clearly established right that was violated.

## II.   **Municipal Liability**

Having concluded that Erste is entitled to qualified immunity, the Court now turns to whether Winder's claim under 42 U.S.C. § 1983 against the District for a violation of procedural due process is viable under <u>Monell v. Department of Social Services of New York</u>, 436 U.S. 658 (1978).  The Court previously reserved ruling on the District's motion for summary judgment on the procedural due process claim.  <u>See</u> <u>Winder</u>, 767 F. Supp. 2d at 184 n. 2.  However, having considered Erste's liability with respect to that claim, it is also now appropriate to consider the parties' arguments regarding the District's liability under <u>Monell.</u>  <u>See</u> Def.'s 2d Mot. for Summ. J. ("Def.'s 2d MSJ") at 13-17, ECF No. 131; Pl.'s Opp'n to 2d Mot. for Summ. J. at 7-14 ("Pl.'s 2d MSJ Opp'n"), ECF No. 137; Def.'s Reply at 5-11, ECF No. 140.

To state a claim under 42 U.S.C. § 1983, Winder must allege "a violation of his rights under the Constitution or federal law" and that the District's "custom or policy caused the violation."  <u>Warren v. District of Columbia</u>, 353 F.3d 36, 38 (D.C. Cir. 2004); <u>see also</u> <u>Tabb v. District of Columbia</u>, 605 F. Supp. 2d 89, 95 (D.D.C. 2009).  The plaintiff must show an "affirmative link . . . such that a municipal policy was the moving force behind the constitutional violation."  <u>Baker v. District of Columbia</u>, 326 F.3d 1302, 1306 (D.C. Cir. 2003) (internal quotations and citations omitted). Such a municipal policy can be based on (1) "the explicit setting of a policy by the government that violates the Constitution," (2) "the action of a policy maker

within the government," (3) "the adoption through a knowing failure to act by a policy maker of actions by his subordinates that are so consistent that they have become 'custom,'" or (4) "the failure of the government to respond to a need . . . in such a manner as to show 'deliberate indifference' to the risk that not addressing the need will result in constitutional violations." Coleman v. District of Columbia, 828 F. Supp. 2d 87, 91 (D.D.C. 2011) (quoting Baker, 326 F.3d at 1306)).

Winder never even alleges in his second amended complaint that such a policy or custom was in place.  This deficiency alone dooms his municipal liability claim.  See, e.g., Coleman, 828 F. Supp. 2d at 90 ("Because this Court finds that [plaintiff] did not properly allege the 'custom or policy' requirement, this Court need not determine whether [plaintiff] sufficiently plead a violation of her constitutional rights."); Blue v. District of Columbia, 850 F. Supp. 2d 16, 30 (D.D.C. 2012) (dismissing due process claim against District because arguments regarding District's custom or policy appeared for the first time in opposition papers but "nowhere in [plaintiff's] second amended complaint"); Clay v. District of Columbia, 831 F. Supp. 2d 36, 44 (D.D.C.  2011) (dismissing procedural due process claim brought against the District because the allegations focused on the actions of a single individual as opposed to "a course the city's policymakers chose to pursue") (internal citations and quotations omitted).

Although Winder's complaint is devoid of any reference to a "policy" or "custom," he nevertheless claims that he has demonstrated a basis for municipal liability against the District under § 1983. See  Pl.'s 2d MSJ Opp'n at 7-8. Winder concedes that he "does not allege the existence of a generally applicable District policy or practice to breach employment contracts." Id. at 10.  Instead, he claims that municipal liability attaches to the District because Erste was the

District's "final policymaker" in denying Winder a termination hearing.  Winder also claims that the "laws of the District of Columbia fail to provide any right to a constitutionally mandated post-termination hearing for a District of Columbia employee who holds a contract for a specific term and is fired before the end of the contract." Id. at 10-11.

Winder's contention that Erste is a "final policymaking authority" must be rejected.  As was the case in Tabb, 605 F. Supp. 2d at 96, Erste had the authority to discharge his subordinates, and used this authority to terminate Winder. But Winder does not allege, nor can he, that Erste, as Chief Operating Officer for DCPS, had the authority to set employment policy for the District of Columbia. See Fox v. District of Columbia, 990 F. Supp. 13, 20 (D.D.C.1997) (finding no municipal liability when the officials responsible for the alleged constitutional deprivation had the authority to make employment decisions, but not to set employment policy for the District) (internal citations omitted).  Looking to D.C. law, the court in Tabb observed that nothing in the defendant's job duties, the District of Columbia Code, or plaintiff's evidence supported a finding that the defendant was a final decisionmaker with respect to employment policy for the District. Tabb, 605 F. Supp. 2d at 97.  Similarly here, Erste was not the Superintendent, nor a member of the school board, nor did he have the authority to set employment policy or to give or deny hearings related to termination decisions. See Coleman, 828 F. Supp. 2d at 91 (observing that "examples from previous cases demonstrate that a final decisionmaker typically must be at least an agency head or a governing body of an agency" and collecting cases); see also D.C. Mun. Regs. tit. 5, § 501 (describing authorities and duties of the Superintendent of Schools).

Winder also now claims in his opposition that a "policy" exists because the CMPA, and the interpretation of that statute by the Office of Employee Appeals ("OEA"), denies any hearing

whatsoever upon termination of an employee who holds a contract for a specific term." Pl.'s

Opp'n at 13. As with his first theory, Winder never asserts this claim in his second amended

complaint. See Arbitraje Case de Cambio, S.A. de C.V. v. U.S. Postal Serv., 297 F. Supp. 2d 165,

171 (D.D.C. 2003) ("It is axiomatic that a complaint may not be amended by the briefs in

opposition to a motion to dismiss.") (internal citations and quotations omitted). Winder alleges no

policy by the District, nor facts that would allow the Court to infer that the District has a policy or

practice (through the CMPA or otherwise) of denying termination hearings to an employee

covered by a term contract. Indeed, it remains to be seen whether Winder was, in fact, covered by

a term contract, and whether, in any event, he was a probationary employee who could be

terminated at any time during that probationary period. And it appears that Winder was the first

person who was terminated post-transformation from Erste's department. See 2011 Erste Dep.

20:16-19. Given the absence of an actionable municipal policy or custom, Winder's procedural

due process claim against the District must be dismissed.[4]

## III.   DC WPA

The DC WPA allows District employees to "function as the 'eyes and ears' of District

taxpayers," Saint-Jean v. District of Columbia, 846 F. Supp. 2d 247, 260 (D.D.C. 2012) (citing

---

[4] Although the Court invited the parties to file supplemental memoranda addressing the issue whether the analysis in Bush v. Lucas, 462 U.S. 367, 388-89 (1983), can be applied to District of Columbia employees alleging procedural due process claims like the one Winder makes against Erste here, defendants instead focused on rehashing their argument that the procedural due process claims should be dismissed for failure to exhaust under the D.C. Comprehensive Merit Personnel Act ("CMPA"), D.C. Code 1-601.01 et seq. Because the Court dismisses the procedural due process claim in its entirety on other grounds, it need not address this restated argument, which has, in any event, been addressed in previous rounds of briefing and opinions. And, as Winder again points out, he sought to have his case heard pursuant to the procedure set forth in the CMPA, and the OEA ultimately determined that it lacked jurisdiction. Winder's Supp. Mem. at 6-8.

Williams v. District of Columbia, 9 A.3d 484, 490 (D.C. 2010)), by prohibiting retaliation against employees based on protected disclosures.  See D.C. Code § 1-615.51-54.  DC WPA claims are analyzed under a burden shifting analytical framework.  Coleman v. District of Columbia, --- F. Supp. 2d ----, 2012 WL 4465784, at * 13 (Sept. 28, 2012) (citing Johnson v. District of Columbia, 935 A.2d 1113 (D.C. 2007)).  A plaintiff must demonstrate (1) that he made a protected disclosure, (2) that his supervisor took or threatened to take a prohibited personnel action against him, and (3) that the protected disclosure was a contributing factor to the retaliation or prohibited personnel action.  Tabb, 605 F. Supp. 2d at 98 (citing Crawford v. District of Columbia, 891 A.2d 216, 218-19 (D.C. 2006)).  The plaintiff carries the initial burden of establishing these elements.  The burden then shifts to the defendant to show "by clear and convincing evidence" that the adverse employment act would have taken place even if plaintiff had not engaged in protected activity.  Coleman, 2012 WL at * 13 (citing Crawford, 891 A.2d at 218).  Finally, plaintiff has the burden of showing that the explanation was pretext. Id.  "Liability under the DC WPA is measured under a 'but' analysis." Johnson, 935 A.2d at 1119 (quoting Crawford, 891 A.2d at 222).

As a threshold issue, Winder urges the Court to apply the definition of "protected disclosure" from the DC WPA, as amended by the Whistleblower Protection Amendment Act of 2009, to the 2003 events at issue. Mots. Hr'g Tr. 64:11-25.  However, the amended definition of "protected disclosure," which arguably broadened the scope of a "protected disclosure," is not simply a procedural change, but rather a change that affects substantive rights; hence, it is inappropriate to apply it to this case. See Saint-Jean, 846 F. Supp. 2d at 260 n.11 (amended definition of "protected disclosure" did not apply retroactively since it "attached new legal consequences to events completed before its enactment") (internal quotations and citations

omitted); see also Lacek v. Wash. Hosp. Ctr. Corp., 978 A.2d 1194, 1197 (D.C. 2009) ("[T]here is the presumption that legislation that affects substantive rights will operate only prospectively.") (citing Landgraf v. USI Film Prods., 511 U.S. 244, 265 (1994)).

Therefore, under the version of the DC WPA that existed prior to the amendment, "protected disclosure" means any disclosure of information, not specifically prohibited by statute, by an employee to a supervisor or a public body[5] that the employee reasonably believes is evidence of: (A) gross mismanagement; (B) gross misuse or waste of public resources or funds; (C) abuse of authority in connection with the administration of a public program or the execution of a public contract; (D) a violation of law, or a contract term between the District and a government contractor which is not of a merely technical or minimal nature; or (E) a substantial and specific danger to the public health and safety. D.C. Code § 1-615.52(6). The DC WPA does not define the term "reasonable believes," but the D.C. Court of Appeals has defined it as whether "a disinterested observer with knowledge of the essential facts known to and readily ascertainable by the employee [could] reasonably conclude that the actions of the government" constituted evidence of one of the above five statutory conditions. Zirkle v. District of Columbia, 830 A.2d 1250, 1259-60 (D.C. 2003) (citing Lachance v. White, 174 F.3d 1378, 1381 (Fed. Cir. 1999).

Assuming Winder can demonstrate that the information he disclosed amounted to "protected disclosures" under the DC WPA, Winder must also show by a preponderance of the evidence that they were a contributing factor to his termination. D.C. Code § 1-615.54. A

---

[5] A public body includes members of the D.C. City Council, and would also appear to include Special Master Baach and her staff. See D.C. Code § 1-615.52(a)(7). The District does not claim that the recipients of Winder's communications fail to satisfy the statutory definition of "supervisor" or "public body."

"contributing factor" is "any factor which, alone or in connection with other factors, tends to affect in any way the outcome of the decision." D.C. Code § 1-615.52(a)(2).  There is no serious dispute that, taking Winder's facts as true, his threatened or actual termination as a result of his disclosures are prohibited personnel actions. <u>See</u> D.C. Code § 1-615.52(5)(A) ("'Prohibited personnel action includes but is not limited to: recommended, threatened, or actual termination."). Instead, the District claims that Winder's communications were not protected under the  DC WPA, nor were they a contributing factor to his termination.  Def.'s DC WPA Mot. at 11; Def.'s Reply at 1.

Although Winder made numerous complaints to various individuals, including Erste, school board and D.C. City council members, the D.C. Inspector General, and Special Master Baach and her staff, he contends that all these complaints should be treated as "a single massive disclosure" regarding DCPS's (and specifically, Erste's) intention not to comply with the <u>Petties</u> orders, <u>see</u> Pl.'s WPA Stmt. ¶ 73. Winder's "kitchen sink" approach to itemizing his complaints makes it difficult to discern whether he is alleging background facts or "protected disclosures" for DC WPA purposes.  Confusing matters further, despite his claim that he made one single massive disclosure, he refers to the slew of sprawling factual allegations as "disclosures."

The DC WPA and its federal counterpart[6] do not speak to whether a "protected disclosure" can be or should be construed as a single massive disclosure, or whether the numerous factual allegations Winder makes should be treated as separate disclosures.  The Court's review of the

---

[6]  The D.C. Court of Appeals has looked to the federal Whistleblower Protection Act, 5 U.S.C. § 2302(b)(8), to analyze claims under the DC WPA. <u>See, e.g.,</u> <u>Wilburn v. District of Columbia</u>, 957 A.2d 921, 925 (D.C. 2008) ("This court has recognized that the federal whistleblower statute . . . is instructive in interpreting similar state statutes, including the DC-WPA.") (internal citations and quotations omitted).

caselaw located no other instance where a plaintiff has urged that his varied complaints be treated as a single disclosure, nor has Winder pointed to any.  However, assuming that it is appropriate to analyze Winder's complaints as one large disclosure -- that Erste did not intend to comply with the Petties orders -- Winder's claim nonetheless fails.

Erste's attitude toward compliance with the Petties orders is not the kind of information that is protected under the DC WPA, which requires that a plaintiff's communication contain information that is not publicly known. Wilburn, 957 A.2d at 925 (statements made to D.C. City Council regarding law firm's poor performance not protected disclosures because already publicly known); Meuwissen v. Dep't of Interior, 234 F.3d 9, 13 (Fed. Cir. 2000) (statements by ALJ regarding previously released opinions were not disclosures "because the Agency's alleged misconduct was not concealed and was already known").  Here, it was already publicly known that DCPS had a dismissive attitude towards compliance with the Petties orders, as reflected by the findings of Special Master Baach in the Petties litigation.  See, e.g., Report and Recommendation of the Special Master Regarding Defendant's Performance (September 2002) at 4, ECF No. 189 ("Special Master Baach R&R") ("[T]he effort by DCPS indicates that even the possibility of fines cannot shake the overall organizational indifference to transportation problems."). Hence, no reasonable juror could conclude that Winder reasonably believed he was disclosing non-public information indicative of "gross mismanagement" that the DC WPA protects.

But, more importantly, even assuming that Erste's intent to comply with the Petties orders could constitute a "protected disclosure," no reasonable factfinder could conclude that it was a contributing factor to his termination.  Winder complained about DCPS's failure to comply with

the Petties orders throughout his employment. Pl.'s WPA Stmt ¶¶ 4, 64 (stating that Winder found "little cooperation" from the defendants "from the beginning of his tenure in the job" and that they "refused to take the Petties Orders seriously."); First Winder Dep. 126:3-8 ("I spoke out well before my termination. I spoke out throughout my tenure."); 2007 Winder Decl. ¶ 61 ("From 2000 until my termination in 2003, I regularly reported problems facing my department . . . . [and] the difficulties I was having in complying with the Court Orders."). He made forty-eight phone calls to Special Master Baach and her staff, and had meetings "over the next two years" with DCPS personnel, including Erste, where he "continued to complain." Sec. Am. Compl. ¶¶ 37-40 & 55. He repeatedly complained about Erste's attitude towards complying with the Petties orders throughout 2002 to 2003. Pl.'s WPA Stmt. ¶¶ 78-80. Such complaints spread out over months or even years are insufficient to establish a causal connection between Winder's complaints and his termination. See Johnson v. District of Columbia, 935 A.2d 1113, 1120 (D.C. 2007) ("[F]our months realistically cannot constitute temporal proximity in the ordinary sense of that phrase."). For all these reasons, Winder's "single massive disclosure" argument that Erste and DCPS had no intention of complying with the Petties orders must fail.

However, in construing the factual allegations in the light most favorable to Winder, the Court will proceed to consider the range of facts that Winder has characterized as "disclosures," and whether they are actionable under the DC WPA. These complaints can be characterized into grievances related to (1) budget and funding; (2) staffing and hiring; and (3) sanitary conditions and the lack of supplies for Winder's department and bus terminal facilities. See Coleman v. District of Columbia, --- F. Supp. 2d. ----, 2012 WL 4465784, at * 14 (D.D.C. Sept. 28, 2012) (summarizing plaintiff's 'dozens of purportedly protected disclosures,' which this court has

reduced for analytical clarity, to . . . categories of communications.").

## A.      Budget and Funding

Winder claims he disclosed to Erste that Erste was improperly diverting and co-mingling transportation funds from special education to general education uses.  These complaints continued from August to November 2002, when Winder repeatedly communicated to Erste that the "practice of diverting funds" failed to devote enough resources towards compliance with the Petties orders. Pl.'s Ans. to Def.'s Interrogatories at 5.  In August 2002 and March 2003, he complained to Erste that the amount of money diverted to regular education purposes amounted to $1.2 or $1.5 million from the transportation budget.  Pl.'s WPA Stmt. ¶ 95.  On December 3, 2002, Winder sent an email to Erste containing these complaints, and also voiced his concerns to Special Master Baach, the D.C. Inspector General, and school board members "before and after" this email.  Id. ¶¶ 99-100; Pl.'s Ans. to Def.'s Interrogatories at 5.

Winder claims that these communications were indicative of DCPS's gross mismanagement and misuse or waste of public resources.  Pl.'s Opp'n at 18-19.  However, Erste's allocation of budgetary priorities within DCPS cannot reasonably be considered evidence of "gross mismangement." While that term is undefined by the DC WPA, the federal whistleblower statute, 5 U.S.C. § 2302(b)(8), has defined "gross mismanagement" as a "management action or inaction which creates a substantial risk of significant adverse impact upon the agency's ability to accomplish its mission."  See Mentzer v. Lanier, 677 F. Supp. 2d 242, 250 (D.D.C. 2010) (applying federal WPA's definition of "gross mismanagement" to analysis of DC WPA) (internal citations omitted).

Winder does not claim that Erste diverted such funds to personal or non-education uses.

Instead, his complaints stem from his disagreement with Erste as to the purported lack of attention Erste and DCPS have paid toward special education needs.  But Winder does not point to a mandate in the Petties orders, or any other law or regulation that requires Erste to fund special education transportation in the exact way or in the precise amount that Winder would find optimal. "Mere differences of opinion between an employee and his agency superiors as to the proper approach to a particular problem or the most appropriate course of action do not rise to the level of gross mismanagement." White v. Dep't of the Air Force, 391 F.3d 1377, 1381 (Fed. Cir. 2004).  The allocation of funds among several competing priorities within an agency is a common problem, not a symptom of "gross mismanagement." See id. at 1383 ("[W]here a dispute is in the nature of a policy dispute, 'gross mismanagement' requires that a claimed agency error in the adoption of, or continued adherence to, a policy be a matter that is not debatable among reasonable people."); see also Zirkle, 830 A.2d at 1259-60 ("A purely subjective perspective of an employee is not sufficient [to demonstrate gross mismanagement] even if shared by other employees."

Moreover, no reasonable juror could find that these complaints played a role in Winder's April 2003 termination. He complained to Erste about the purported diversion of funds starting in August 2002.  2011 Winder Dep. 74:14-76:5.  Indeed, these complaints may have begun even earlier. See Sec. Am. Compl. ¶ 45-48.  Winder also disclosed the diversion and/or co-mingling of funds "two or three times each week during the period July, 2002 through March, 2003" to Erste, Superintendent Vance, and school board and city council members "on at least a dozen occasions."  Pl.'s Ans. to Def.'s Interrogatories at 6.  And he continued to complain about the diversion of funds to Erste, Special Master Baach, the D.C. Inspector General, and then-D.C. School Board President Peggy Cafritz "both before and after" he had sent the December 3, 2002

email.  Hence, these communications regarding the diversion of funds could not be considered

"protected disclosures" under the DC WPA.[7]

**B.       Hiring and Staffing Practices**

Winder's various complaints about DCPS hiring and staffing practices also fall short of

"protected disclosures."  Winder contends that he disclosed Erste's hiring practices of employing

unqualified personnel, including drivers and friends who performed no work but remained on the

payroll, to the same individuals (Special Master Baach, Erste, and others), and that this evidence

was indicative of "gross mismanagement" and "abuse of authority" by DCPS. Pl.'s WPA Opp'n at

18-20.  However, the communications Winder points to regarding this subject were already

known by Erste, Special Master Baach, and the public at large.  See Wilburn, 957 A.2d at 925

(information must not be publicly known); Hawkins v. Boone, 786 F. Supp. 2d 328, 334 (D.D.C.

2011) (same).

The facts relating to the Petties litigation and the newspaper articles cited by Winder in his

February 24, 2003 complaint to the Inspector General make clear that problems with the

transportation of special education students -- namely "absenteeism, nepotism, unqualified

workers and payroll foul-ups" -- were rampant, and known as early as February 2001.[8]   See

---

[7]  Other complaints made by Winder regarding the diversion of resources from special education
to other uses also fail to constitute protected disclosures. These include complaints about
scheduling issues; bus quality; the use of buses and bus drivers for prayer breakfasts and other
social events; and the renting out of parking spaces to a nightclub next door.  Some of these
complaints were already known, and formed the basis of the Petties litigation.  In addition,
Winder claims that he complained about these matters beginning in August 2002.  Pl.'s Ans. to
Def.'s Interrogatories at 9.  Here too, the gap between these complaints and his termination is too
great for the complaints to be considered a contributing factor.

[8]  Although Winder cites to the article as being dated February 2002, the article from the
Washington Times is actually dated February 23, 2001 and is titled "Fixing D.C. School Bus
Flaws - Nepotism, Unqualified Workers Hamstring Reforms."  The Court takes judicial notice of
the article, and in general may take judicial notice of matters of a general public nature.  See

Pl.'s Ex. E at 1-4, ECF No. 94-7; Jabeen Bhati, "Fixing D.C.'s School Bus Flaws - Nepotism, Unqualified Workers Hamstring Reforms", Wash. Times, Feb. 23, 2001, at C1.  Special Master Baach's Report and Recommendation also indicates that she was aware of the problems related to staffing issues and unqualified bus drivers in September and August 2002.  Special Master Baach R&R at 5-10 (discussing problems related to inadequate number of drivers).[9]

As with his other communications, Winder "repeatedly disclosed" that DCPS was hiring unqualified bus drivers as early as July 2002. Pl.'s Ans. to Def.'s Interrogatories at 7.  And he made "repeated disclosures" in August 2002 that buses and drivers were being used to drive DCPS executive staff to social events.  Id. at 9.  He spoke out about "financial irregularities" relating to "DCPS hiring and paying salaries of consultants and relatives and cronies of those in power" in August 2002 through the spring of 2003.  Id. at 6. He complained about other hiring decisions, including the hiring of a "go-go dancer" related to a DCPS employee, in July, August, and September 2002.  Id. at 7. The measure of time that passed between when Winder first allegedly disclosed all this information, and when he was terminated in April 2003, or even claims he was threatened with termination in February 2003, is too long of a gap to be considered a contributing factor to his termination.  See Johnson, 935 A.2d at 1120.

## C.    Supplies and Facilities

Finally, Winder's complaints about the conditions of the restrooms and facilities, including

---

Gov't of Rwanda v. Rwanda Working Grp., 227 F. Supp. 2d 45, 60 n. 6 (D.D.C. 2002) (citing Marshall Cnty. Health Care Auth. v. Shalala, 988 F.2d 1221, 1226 (D.C. Cir. 1993)).

[9]  Winder also indicates in his second amended complaint that he had complained in March 2001 that Erste and DCPS were interfering with his job duties, and reported issues related to the number of staff vacancies and untrained employees during that same time. Sec. Am. Compl. ¶¶ 45-48.  The record does not appear to contain further references to these events, which also would militate against finding a causal connection between Winder's complaints and his termination.

the lack of trash pickup, are not protected disclosures because they did not constitute a danger to the public health and safety. See, e.g., Auston v. Merit Sys. Protect. Bd., 371 Fed. App'x 96, 101 (Fed. Cir. 2010) (finding that the "involved danger 'must be substantial and specific,' as opposed to 'negligible', 'ill-defined,' or 'only potentially arising in the future . . . .'") (quoting and citing Chambers v. Dep't of the Interior, 515 F.3d 1362, 1369 (Fed. Cir. 2008)).  Moreover, Winder concedes that he complained to Special Master Baach about the pile-up of trash and the lack of drinking water "in 2001," Sec. Am. Compl. ¶ 49, and continued to complain "two or three times a week" from July 2002 through March 2003. Pl.'s WPA Stmt. ¶ 158.

*       *       *

Even assuming that Winder's complaints were "protected disclosures," they all either spanned the entire tenure of his employment, or began during a time so far removed from his termination that no reasonable factfinder could conclude that they played a role in his firing. Winder was rehired multiple times while he made these complaints.  Despite the parties' disagreement over whether Winder's position was abolished due to a RIF, Winder concedes that he applied for his position in May 2002, and was selected over two other candidates, see 2007 Winder Affidavit ¶ 65.  Hence, many of these factual allegations, even when construed in the light most favorable to Winder, fail to satisfy the criteria under the WPA.

**D.    D.C. City Council Testimony and Complaint to Inspector General**

1.    *Work Stoppage*

Winder indicates that he began complaining about inaccurate payroll and leave records as early as 2001, Sec. Am. Compl. ¶ 46, and that inaccurate payroll and leave records remained a constant problem. 2011 Winder Dep. 198-207.  Hence, these were not new communications in 2003, and they are not protected under the DC WPA.  However, some of Winder's claims are

slightly more specific. These payroll and leave problems, which were already known, led to a work stoppage in mid-January 2003.  Around Christmas 2002, Winder claims he disclosed to Erste that problems with the drivers' leave records and inaccurate recordkeeping of their holiday pay would lead to labor problems, but Erste left on vacation without addressing the issue.  Pl.'s Ans. to Def.'s Interrogatories at 8.  Winder states that he continued to warn Erste in the first two weeks of January 2003 that a possible work stoppage might occur due to driver dissatisfaction with the recordkeeping of their pay. Id. This work stoppage eventually took place on January 16 and 17, 2003. Pl.'s WPA Stmt. ¶ 156.  As a result of the work stoppage, between thirty-five and forty percent of drivers were absent from work, impacting thirty to forty percent of the Petties class members for two days. The Special Master attempted to convene an emergency meeting over the weekend to address the issue, but no one from DCPS could attend. Id. ¶¶ 175-78.

After the walkout, Erste and Khabo testified before the D.C. City Council.  D.C. Councilman Chavous was unsatisfied with Erste and Khabo's responses, and called Winder to the witness table to answer questions.  Pl.'s WPA Stmt.¶ 179 (citing 2007 Winder Aff. ¶ 93).  The record is incomplete as to the specifics of Winder's testimony. Winder claims, however, that he communicated previously unknown information as part of his testimony, see Pl.'s WPA Opp'n 24-27; that he provided information relating to the reasons for the work stoppage; and that he "disclosed that the work stoppage was Erste's fault because he refused to address the problem timely." Pl.'s WPA Stmt. ¶ 157; Pl.'s Ans. to Interrogatories at 8.  After Winder's testimony, Erste "express[ed] opposition and hostility" and Winder heard Erste tell Kevin Walsh, who worked for Special Master Baach, that "I should have fired that motherf****r when I had the chance."  Pl.'s WPA Stmt. ¶ 180; 2007 Winder Decl. ¶ 94.  A few weeks after Winder's testimony and a week after the receiver motion was filed, Winder claims that Erste and Khabo began pressuring him to

resign. 2007 Winder Aff. ¶¶ 93, 97-98.  Winder was terminated in early April 2003.

Specific information regarding the work stoppage, provided that it was not already known, is the kind of information that "a disinterested observer with knowledge of the essential facts known to and readily ascertainable by the employee [could] reasonably conclude" was evidence of gross mismanagement, illegality, or waste within the statutory definition of the DC WPA.  Zirkle, 830 A.2d at 1259-60.  Winder claims that he made previously unknown and particular disclosures regarding Erste's role in the work stoppage, and that he provided specific information as to why it occurred.  But on this issue, the record is incomplete.  No party has provided a transcript or account of the proceedings before the City Council. And Winder does not identify exactly what he divulged that warrants treatment as a protected disclosure.  Part of the reason for the lack of specificity may be due to Winder's claim that his complaints should be treated a single massive disclosure -- an untenable position for the reasons already discussed.

The District sheds no light on Winder's testimony before the City Council either. It has not responded to Winder's assertion that he made unknown and particular disclosures, and has pointed to no evidence -- nor could the Court locate any in the record -- rebutting Winder's claim that Erste stated "I should have fired that motherf****r when I had the chance" immediately after Winder testified.  Pl.'s WPA Stmt. ¶ 180; 2007 Winder Aff. ¶ 94. Instead, the District simply categorically denies that Winder's statements at the hearing were relevant, or that they constituted protected disclosures at all.  See Def.'s WPA Reply to Pl.'s WPA Stmt ¶ 179.  It also relies more generally on its argument that Winder's communications (including, presumably, his testimony to the Council) were not protected disclosures under the DC WPA because the District's deficient response to the transportation needs of special education students was already publicly known, and indeed, formed the basis of the Petties litigation.  But a similar argument was rejected in

Williams v. Johnson, 701 F. Supp. 2d 1, 16 (D.D.C. 2010). There, the plaintiff had testified

regarding failures of a software system implemented by the District. In denying summary

judgment on the plaintiff's DC WPA's claims, the court in Williams reasoned that although

statements from the councilmember "suggest[ed] that he was already aware or at least suspected"

that certain software commissioned by the District was not performing as expected, "it does not

necessarily demonstrate that he was also aware of the specific details disclosed by Plaintiff during

the hearing."  Id. at 16.  So, too, here.  And in Mentzer, 677 F. Supp. 2d at 250-51, the court

reasoned that it was not apparent from the record whether plaintiffs actually disclosed any new

information to a City Councilmember during a meeting, but because they had "complained about

specific details regarding the stabling of horses," it was therefore "probable that some of these

details were not public knowledge available to Councilmember Graham prior to the meeting." See

id.  at 255-56 & 261.

        The Court acknowledges that it is Winder's burden to show that he made a protected

disclosure, and that the disclosure was a contributing factor to a prohibited action. Tabb, 605 F.

Supp. 2d at 98 (citing Crawford, 891 A.2d at 218-19).  But given Winder's assertions that he

provided specific, non-public disclosures during his testimony, the District's silence on these

particular points, and the existing record before the Court, there remains some question whether

any aspect of Winder's testimony was a "protected disclosure" and, if so, whether that disclosure

caused Winder's termination or threatened termination. See Tabb, 605 F. Supp. 2d at 98 (denying

summary judgment on WPA claim where genuine issue of material fact existed as to whether

disclosures were already known).  Ultimately, it may be that Winder's testimony divulged no new

information, or his testimony consisted of information that would be unprotected by the DC WPA.

But in viewing the factual assertions in the light most favorable to Winder, it is plausible that

information Winder provided to the D.C. Council was similar to the types of information given by

the plaintiffs in Williams and Mentzer.  For those reasons, the Court will at this time deny the

District's motion for summary judgment on Winder's DC WPA claim regarding his D.C. Council

testimony.

2.     *False Affidavit and Complaint to Inspector General*

Similar questions arise with respect to Winder's DC WPA claim as it relates to his refusal

to submit a false affidavit and his subsequent complaint to the Inspector General.  Winder claims

that during a meeting on February 3, 2003, Erste wanted Winder to submit a false affidavit in

support of the District's opposition to the motion to appoint a receiver in the Petties litigation.

According to Winder, Erste wanted him to certify that the transportation department was fully

funded, and that staffing was adequate. Pl.'s Ans. to Def.'s Interrogatories at 10. Winder refused to

do so.  Pl.'s WPA Stmt. ¶¶ 182-85.  He claims that Erste's reaction after his refusal was: "'I'll take

care of you down the road.' or words to that effect." Id. ¶ 185 (citing 2011 Winder Dep. at 249).

During that same meeting, Erste told Winder that he would have to resign, which was repeated to

Winder a few days later.  Id.  ¶¶ 186-87.  On February 10, 2003, the District filed its opposition to

the receiver motion, which included declarations from Erste and Khabo, which Winder claims

contained false information. Id. ¶¶ 188-191.  Two weeks later, Winder filed a complaint with the

D.C. Inspector General against Erste and Khabo.  See Pl.'s Ex. E at 1-4, ECF No. 94-7.  That

complaint asserted that Erste and Khabo had filed false affidavits to the court regarding the

District's Petties compliance, and sought an investigation into the same complaints that Winder

had previously made. Id.; Pl.'s WPA Stmt. ¶ 192.

The bulk of Winder's grievances to the Inspector General, which mirror his other

complaints, fail for the reasons already explained above. But Winder's allegation that he told Erste

he refused to file a false affidavit, coupled with his complaint to the Inspector General disclosing the filing of the allegedly false affidavits by Erste and Khabo, is serious enough to constitute a "protected disclosure" under the DC WPA since Winder could have reasonably believed he was disclosing evidence of a violation of law.  Winder also claims that Erste knowingly violated the law by filing a false affidavit, and that Erste knew about the complaint to the Inspector General because Winder himself had told Erste about it. 2011 Winder Dep. 247-54; Mots. Hr'g Tr. 58:10-15.  Again, the District has not specifically rebutted these contentions nor could the Court, based on the record before it, identify any rebuttal to Winder's claim.[10]

It is an open question as to whether Winder's filing of a complaint with the Inspector General was a contributing factor to his termination, which occurred a little over a month later. Erste did not recall when he decided to terminate Winder, 2011 Erste Dep. 21:10-18 & 22:20-23:21, although he claims that discussions about terminating Winder involved a "long-drawn out process." 2005 Erste Dep. 11-12. The DCPS's General Counsel remembered that Winder filed the complaint with the Inspector General, and stated that she would have asked Erste whether he terminated Winder because of it; but ultimately, she did not recall whether it played a role in Winder's termination.  Mazyck Dep. 41:44.  An email chain relating to the drafting of Winder's termination letter from Human Resources states: "My recommendation is to use the standard letter for termination of employment based on probationary period.  We should issue the same notice to him as we do with all employees and not treat Mr. Winder differently." See Email from Eileen

---

[10]  Presumably, the affidavits were attached to the District's opposition to the receiver motion in the Petties litigation.  See Petties, Civ. Action No. 95-0148-PLF (D.D.C), ECF Nos. 1025-1026. The documents associated with the docket entry for that 2003 opposition, which indicates the filing of a "bulky pleading," are not available on the electronic case docket. Only a brief excerpt of Khabo's affidavit was affixed to Winder's opposition to an earlier summary judgment motion, see Pl.'s Ex. F, ECF No. 94-7.  No party has provided Erste's and Khabo's affidavits in their entirety to the Court.

Clements to Kennedy Khabo (Apr. 3, 2003), ECF No. 159-11.

As Winder points out, the District focuses its arguments on the deficiencies of Winder's complaints, rather than the reasons for Winder's termination.  But the District generally claims that, assuming Winder could satisfy the requirements of the WPA, it nonetheless had a legitimate reason for firing him -- namely, his failure to perform at his job and to avoid receivership. Although the District claims that Winder's failure to perform his duties under the Petties orders, see 2011 Erste Dep. 43-44; 2005 Erste Dep. 11-12 & 155, and his failure to avoid receivership, see Def.'s QI Stmt. ¶ 22; Def.'s WPA Reply at 16, are the reasons Winder was fired, DCPS was not yet in receivership when Winder was terminated in early 2003.  Indeed, the motion to appoint a receiver was filed in late January 2003, but was not resolved until June 2003 -- two months after Winder was terminated.  In addition, there are positive remarks about Winder's performance in the record, see, e.g., Letter from D.C. Councilmember Vincent Orange to DCPS Superintendent Paul Vance (May 14, 2002), ECF No. 94-13; Pl.'s WPA Stmt. ¶¶ 66, 71-72 (praising Winder's efforts to comply with Petties orders and noting Winder's DCPS Superintendent's Award of Excellence in 2000).  And, as Winder points out, there were no written reflections of poor performance. Pl.'s WPA Stmt. ¶ 40.  Finally, the issue of who bore the responsibility for compliance failures under the Petties orders has always been hotly contested, with Winder placing the blame on Erste and Erste claiming that any failures rested on Winder.  Ultimately, however, Winder was terminated in a sparsely worded letter on the basis of his probationary status, despite four years of employment with DCPS.  Taken in the light most favorable to Winder on the present record, the District has not demonstrated by clear and convincing evidence that Winder would have been terminated regardless of the evidence and timing of the above events.  And a reasonable factfinder, based on the existing record, could credit Winder's explanation that the proffered reasons by the District

were pretextual. See Kakeh v. United Planning Org., 655 F. Supp. 2d 107, 119 (D.D.C. 2009) (although plaintiff's protected activity began in October 2003, a reasonable juror could conclude that plaintiff -- who suddenly became the focus of a RIF in June 2004, and had been seen meeting with the Office of the Inspector General a day before he was terminated -- suffered retaliation because of his disclosures).

*     *     *

Summary judgment is warranted on the majority of the "disclosures" Winder identifies as the bases for his DC WPA claim, and the Court will grant the District's motion with respect to those issues.  But, at this time, the Court will deny summary judgment on the following three issues relating to whether Winder made protected disclosures through (1) his D.C. Council testimony, (2) his conversation with Erste relating to the filing of a false affidavit, and (3) his complaint to the Inspector General regarding Erste's and Khabo's purportedly false affidavits, and, if so, on the issue whether any of these disclosures was a contributing factor in his termination.

Considering the close temporal proximity of the above incidents to his termination, and Winder's position that his communications should be bundled as a single large disclosure, the Court hesitates to penalize Winder because of his failure to point to robust and particularized facts on these three specific events, even though he bears the burden of satisfying the requirements for bringing a DC WPA claim.  The record and briefings from both parties are too incomplete for the Court to determine whether a genuine factual dispute indeed exists on these lingering issues.  A better course is to allow the parties another opportunity to hone in on the facts relating to these issues and to supplement the record as necessary with respect to these incidents.  Therefore, the District will be given one final opportunity to file a renewed motion for summary judgment on the remnants of Winder's DC WPA claim, which the Court instructs shall be limited to the three

events listed above.  As to all other matters raised under the DC WPA, the Court will grant

summary judgment to the District.

## CONCLUSION

The Court will grant summary judgment to defendants on the procedural due process claim

and will grant in part and deny in part the District's motion for summary judgment on Winder's

DC WPA claims. A separate order accompanies this memorandum opinion.

**SO ORDERED.**

_____/s/_____

JOHN D. BATES
United States District Judge

Dated: <u>November 19, 2012</u>